# JACKSON v. BIRMINGHAM BOARD OF EDUCATION

No. 02–1672.   Argued November 30, 2004—Decided March 29, 2005

O'CONNOR, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., joined, *post*, p. 184.

*Walter Dellinger* argued the cause for petitioner. With him on the briefs were *Marcia D. Greenberger, Jocelyn Samuels, Dina R. Lassow, Matthew D. Roberts,* and *Pamela A. Harris.*

*Irving L. Gornstein* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Clement, Assistant Attorney General Acosta, Dennis J. Dimsey,* and *Linda F. Thome.*

*Kenneth L. Thomas* argued the cause for respondent. With him on the brief was *Valerie L. Acoff.*

*Kevin C. Newsom,* Solicitor General of Alabama, argued the cause for the State of Alabama et al. as *amici curiae* urging affirmance. With him on the brief were *Troy King,* Attorney General, and the Attorneys General for their respective States as follows: *M. Jane Brady* of Delaware, *Mark J. Bennett* of Hawaii, *Brian Sandoval* of Nevada, *Hardy Myers* of Oregon, *Lawrence E. Long* of South Dakota, *Paul G. Summers* of Tennessee, *Mark L. Shurtleff* of Utah, and *Jerry W. Kilgore* of Virginia.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Bar Association by *Robert J. Grey, Jr., Nancy L. Perkins,* and *Kristen Galles;* for the Leadership Conference on Civil Rights by *Virginia A. Seitz, Steven Shapiro,* and *Lenora M. Lapidus;* for the National Education Association et al. by *Jeremiah A. Collins, Alice O'Brien, David M. Rabban, Donna R. Euben,* and *Ann D. Springer;* for the National Partnership for Women & Families et al. by *Caroline M. Brown;* for New York Lawyers for the Public Interest et al. by *Jeffrey A. Lamken, Macey Reasoner Stokes, J. Richard Cohen,* and *Rhonda Brownstein;* and for Birch Bayh by *John F. Cooney, Margaret N. Strand,* and *Kevin O. Faley.*

Briefs of *amici curiae* urging affirmance were filed for the Eagle Forum Education & Legal Defense Fund by *Andrew L. Schlafly;* for the National School Boards Association et al. by *Julie Underwood* and *Naomi Gittins;* for the National Wrestling Coaches Association by *Lawrence J. Joseph;* and for the Pacific Legal Foundation by *John H. Findley.*

Briefs of *amici curiae* were filed for the College Sports Council by *Mr. Joseph;* and for the Women's Sports Foundation et al. by *Nancy Hogshead-Makar* and *Howard R. Rubin.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Roderick Jackson, a teacher in the Birmingham, Alabama, public schools, brought suit against the Birmingham Board of Education (Board) alleging that the Board retaliated against him because he had complained about sex discrimination in the high school's athletic program. Jackson claimed that the Board's retaliation violated Title IX of the Education Amendments of 1972, Pub. L. 92–318, 86 Stat. 373, as amended, 20 U. S. C. § 1681 *et seq.* The District Court dismissed Jackson's complaint on the ground that Title IX does not prohibit retaliation, and the Court of Appeals for the Eleventh Circuit affirmed. 309 F. 3d 1333 (2002). We consider here whether the private right of action implied by Title IX encompasses claims of retaliation. We hold that it does where the funding recipient retaliates against an individual because he has complained about sex discrimination.

I

Because Jackson's Title IX claim was dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, "we must assume the truth of the material facts as alleged in the complaint." *Summit Health, Ltd.* v. *Pinhas,* 500 U. S. 322, 325 (1991).

According to the complaint, Jackson has been an employee of the Birmingham school district for over 10 years. In 1993, the Board hired Jackson to serve as a physical education teacher and girls' basketball coach. Jackson was transferred to Ensley High School in August 1999. At Ensley, he discovered that the girls' team was not receiving equal funding and equal access to athletic equipment and facilities. The lack of adequate funding, equipment, and facilities made it difficult for Jackson to do his job as the team's coach.

In December 2000, Jackson began complaining to his supervisors about the unequal treatment of the girls' basketball team, but to no avail. Jackson's complaints went unanswered, and the school failed to remedy the situation. In-

stead, Jackson began to receive negative work evaluations and ultimately was removed as the girls' coach in May 2001. Jackson is still employed by the Board as a teacher, but he no longer receives supplemental pay for coaching.

After the Board terminated Jackson's coaching duties, he filed suit in the United States District Court for the Northern District of Alabama. He alleged, among other things, that the Board violated Title IX by retaliating against him for protesting the discrimination against the girls' basketball team. Amended Complaint 2–3, App. 10–11. The Board moved to dismiss on the ground that Title IX's private cause of action does not include claims of retaliation. The District Court granted the motion to dismiss.

The Court of Appeals for the Eleventh Circuit affirmed. 309 F. 3d 1333 (2002). It assumed, for purposes of the appeal, that the Board retaliated against Jackson for complaining about Title IX violations. It then held that Jackson's suit failed to state a claim because Title IX does not provide a private right of action for retaliation, reasoning that "[n]othing in the text indicates any congressional concern with retaliation that might be visited on those who complain of Title IX violations." *Id.*, at 1344. Relying on our decision in *Alexander* v. *Sandoval,* 532 U. S. 275 (2001), the Court of Appeals also concluded that a Department of Education regulation expressly prohibiting retaliation does not create a private cause of action for retaliation: "Because Congress has not created a right through Title IX to redress harms resulting from retaliation, [the regulation] may not be read to create one either." 309 F. 3d, at 1346. Finally, the court held that, even if Title IX prohibits retaliation, Jackson would not be entitled to relief because he is not within the class of persons protected by the statute.

We granted certiorari, 542 U. S. 903 (2004), to resolve a conflict in the Circuits over whether Title IX's private right of action encompasses claims of retaliation for complaints about sex discrimination. Compare *Lowrey* v. *Texas A & M*

*Univ. System,* 117 F. 3d 242, 252 (CA5 1997) ("[T]itle IX affords an implied cause of action for retaliation"); *Preston* v. *Virginia ex rel. New River Community College,* 31 F. 3d 203, 206 (CA4 1994) (same), with the case below, *supra.*

## II

### A

Title IX prohibits sex discrimination by recipients of federal education funding. The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U. S. C. § 1681(a). More than 25 years ago, in *Cannon* v. *University of Chicago,* 441 U. S. 677, 690–693 (1979), we held that Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination. In subsequent cases, we have defined the contours of that right of action. In *Franklin* v. *Gwinnett County Public Schools,* 503 U. S. 60 (1992), we held that it authorizes private parties to seek monetary damages for intentional violations of Title IX. We have also held that the private right of action encompasses intentional sex discrimination in the form of a recipient's deliberate indifference to a teacher's sexual harassment of a student, *Gebser* v. *Lago Vista Independent School Dist.,* 524 U. S. 274, 290–291 (1998), or to sexual harassment of a student by another student, *Davis* v. *Monroe County Bd. of Ed.,* 526 U. S. 629, 642 (1999).

In all of these cases, we relied on the text of Title IX, which, subject to a list of narrow exceptions not at issue here, broadly prohibits a funding recipient from subjecting any person to "discrimination" "on the basis of sex." 20 U. S. C. § 1681. Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an in-

tentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment. See generally *Olmstead* v. *L. C.*, 527 U. S. 581, 614 (1999) (KENNEDY, J., concurring in judgment) (the "normal definition of discrimination" is "differential treatment"); see also *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 682, n. 22 (1983) (discrimination means "less favorable" treatment). Moreover, retaliation is discrimination "on the basis of sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional "discrimination" "on the basis of sex," in violation of Title IX.

The Court of Appeals' conclusion that Title IX does not prohibit retaliation because the "statute makes no mention of retaliation," 309 F. 3d, at 1344, ignores the import of our repeated holdings construing "discrimination" under Title IX broadly. Though the statute does not mention sexual harassment, we have held that sexual harassment is intentional discrimination encompassed by Title IX's private right of action. *Franklin*, 503 U. S., at 74–75; see also *id.*, at 75 (noting that, under *Meritor Savings Bank, FSB* v. *Vinson*, 477 U. S. 57, 64 (1986), " 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex,' " and holding that "the same rule should apply when a teacher sexually harasses . . . a student"). Thus, a recipient's deliberate indifference to a teacher's sexual harassment of a student also "violate[s] Title IX's plain terms." *Davis*, *supra*, at 643 (citing *Gebser*, *supra*, at 290–291). Likewise, a recipient's deliberate indifference to sexual harassment of a student by another student also squarely constitutes "discrimination" "on the basis of sex." *Davis*, 526 U. S., at 643; see also *id.*, at 650 ("Having previously determined that 'sexual harassment' is 'discrimination' . . . under Title IX, we are constrained to conclude

that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute"). "Discrimination" is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach. See *North Haven Bd. of Ed.* v. *Bell,* 456 U. S. 512, 521 (1982) (Courts "'must accord'" Title IX "'a sweep as broad as its language'").

Congress certainly could have mentioned retaliation in Title IX expressly, as it did in § 704 of Title VII of the Civil Rights Act of 1964, 78 Stat. 257, as amended, 86 Stat. 109, 42 U. S. C. § 2000e–3(a) (providing that it is an "unlawful employment practice" for an employer to retaliate against an employee because he has "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]"). Title VII, however, is a vastly different statute from Title IX, see *Gebser,* 524 U. S., at 283–284, 286–287, and the comparison the Board urges us to draw is therefore of limited use. Title IX's cause of action is implied, while Title VII's is express. See *id.,* at 283–284. Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition. See 20 U. S. C. § 1681. By contrast, Title VII spells out in greater detail the conduct that constitutes discrimination in violation of that statute. See 42 U. S. C. §§ 2000e–2 (giving examples of unlawful employment practices), 2000e–3 (prohibiting "[o]ther unlawful employment practices," including (a) "[d]iscrimination" in the form of retaliation; and (b) the discriminatory practice of "[p]rinting or publication of notices or advertisements indicating prohibited preference . . . "). Because Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered.

Title IX was enacted in 1972, three years after our decision in *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229 (1969). In *Sullivan,* we held that Rev. Stat. § 1978, 42 U. S. C. § 1982, which provides that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property," protected a white man who spoke out against discrimination toward one of his tenants and who suffered retaliation as a result. Sullivan had rented a house to a black man and assigned him a membership share and use rights in a private park. The corporation that owned the park would not approve the assignment to the black lessee. Sullivan protested, and the corporation retaliated against him by expelling him and taking his shares. Sullivan sued the corporation, and we upheld Sullivan's cause of action under 42 U. S. C. § 1982 for "[retaliation] for the advocacy of [the black person's] cause." 396 U. S., at 237. Thus, in *Sullivan* we interpreted a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition.[1]

Congress enacted Title IX just three years after *Sullivan* was decided, and accordingly that decision provides a valuable context for understanding the statute. As we recognized in *Cannon,* "it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with *[Sullivan]* and that it expected its enactment [of Title IX] to be interpreted in conformity with [it]." 441 U. S., at 699; see also *id.,* at 698, n. 22. Retaliation for Jackson's advocacy of the rights of the girls' basketball team in this case is "dis-

---

[1] JUSTICE THOMAS contends that *Sullivan* merely decided that the white owner had standing to assert the rights of the black lessee. *Post,* at 194 (dissenting opinion). But *Sullivan's* holding was not so limited. It plainly held that the white owner could maintain his *own* private cause of action under § 1982 if he could show that he was "punished for trying to vindicate the rights of minorities." 396 U. S., at 237.

crimination" "on the basis of sex," just as retaliation for advocacy on behalf of a black lessee in *Sullivan* was discrimination on the basis of race.

## B

The Board contends that our decision in *Alexander* v. *Sandoval*, 532 U. S. 275 (2001), compels a holding that Title IX's private right of action does not encompass retaliation. *Sandoval* involved an interpretation of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U. S. C. § 2000d *et seq.*, which provides in § 601 that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. 42 U. S. C. § 2000d. Section 602 of Title VI authorizes federal agencies to effectuate the provisions in § 601 by enacting regulations. Pursuant to that authority, the Department of Justice promulgated regulations prohibiting funding recipients from adopting policies that had "the effect of subjecting individuals to discrimination because of their race, color, or national origin." 28 CFR § 42.104(b)(2) (1999). The *Sandoval* petitioners brought suit to enjoin an English-only policy of the Alabama Department of Public Safety on grounds that it disparately impacted non-English speakers in violation of the regulations. Though we assumed that the regulations themselves were valid, see 532 U. S., at 281, we rejected the contention that the private right of action to enforce intentional violations of Title VI encompassed suits to enforce the disparate-impact regulations. We did so because "[i]t is clear . . . that the disparate-impact regulations do not simply apply § 601— since they indeed forbid conduct that § 601 permits—and therefore clear that the private right of action to enforce § 601 does not include a private right to enforce these regulations." *Id.*, at 285. See also *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 173

(1994) (A "private plaintiff may not bring a [suit based on a regulation] against a defendant for acts not prohibited by the text of [the statute]"). Thus, *Sandoval* held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination.

The Board cites a Department of Education regulation prohibiting retaliation "against any individual for the purpose of interfering with any right or privilege secured by [Title IX]," 34 CFR § 100.7(e) (2004) (incorporated by reference by § 106.71), and contends that Jackson, like the petitioners in *Sandoval*, seeks an "impermissible extension of the statute" when he argues that Title IX's private right of action encompasses retaliation. Brief for Respondent 45. This argument, however, entirely misses the point. We do not rely on regulations extending Title IX's protection beyond its statutory limits; indeed, we do not rely on the Department of Education's regulation at all, because the statute *itself* contains the necessary prohibition. As we explain above, see *supra*, at 174–175, the text of Title IX prohibits a funding recipient from retaliating against a person who speaks out against sex discrimination, because such retaliation is intentional "discrimination" "on the basis of sex." We reach this result based on the statute's text. In step with *Sandoval*, we hold that Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex.[2]

---

[2] We agree with JUSTICE THOMAS that plaintiffs may not assert claims under Title IX for conduct not prohibited by that statute. *Post*, at 193 (dissenting opinion). See also *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 173 (1994) ("[T]he private plaintiff may not bring a 10b–5 suit against a defendant for acts not prohibited by the text of § 10(b)"). But we part ways with regard to our reading of the statute. We interpret Title IX's text to clearly prohibit retaliation for complaints about sex discrimination.

## C

Nor are we convinced by the Board's argument that, even if Title IX's private right of action encompasses discrimination, Jackson is not entitled to invoke it because he is an "indirect victi[m]" of sex discrimination. Brief for Respondent 33. The statute is broadly worded; it does not require that the victim of the retaliation must also be the victim of the discrimination that is the subject of the original complaint. If the statute provided instead that "no person shall be subjected to discrimination on the basis of *such individual's* sex," then we would agree with the Board. Cf. 42 U. S. C. § 2000e–2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of *such individual's* race, color, religion, sex, or national origin" (emphasis added)). However, Title IX contains no such limitation. Where the retaliation occurs because the complainant speaks out about sex discrimination, the "on the basis of sex" requirement is satisfied. The complainant is himself a victim of discriminatory retaliation, regardless of whether he was the subject of the original complaint.[3] As we explain above, see *supra*, at 176–177, this is consistent with *Sullivan*, which formed an important part

[3] JUSTICE THOMAS contends that "extending the implied cause of action under Title IX to claims of retaliation expands the class of people the statute protects beyond the specified beneficiaries." *Post*, at 194 (dissenting opinion). But Title IX's beneficiaries plainly include all those who are subjected to "discrimination" "on the basis of sex." 20 U. S. C. § 1681(a). Because, as we explain above, see *supra*, at 174–175, retaliation in response to a complaint about sex discrimination is "discrimination" "on the basis of sex," the statute clearly protects those who suffer such retaliation. The following hypothetical, offered by petitioner at oral argument, illustrates this point: If the male captain of the boys' basketball team and the female captain of the girls' basketball team together approach the school principal to complain about discrimination against the girls' team, and the principal retaliates by expelling them both from the honor society, then both the female and the male captains have been "discriminated" against "on the basis of sex." Tr. of Oral Arg. 53–54.

of the backdrop against which Congress enacted Title IX. *Sullivan* made clear that retaliation claims extend to those who oppose discrimination against others. See 396 U. S., at 237 (holding that a person may bring suit under 42 U. S. C. § 1982 if he can show that he was "punished for trying to vindicate the rights of minorities").

Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also "to provide individual citizens effective protection against those practices." *Cannon*, 441 U. S., at 704. We agree with the United States that this objective "would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation." Brief for United States as *Amicus Curiae* 13. If recipients were permitted to retaliate freely, individuals who witness discrimination would be loath to report it, and all manner of Title IX violations might go unremedied as a result. See *Sullivan, supra,* at 237 (noting that without protection against retaliation, the underlying discrimination is perpetuated).

Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel. Recall that Congress intended Title IX's private right of action to encompass claims of a recipient's deliberate indifference to sexual harassment. See generally *Davis*, 526 U. S. 629. Accordingly, if a principal sexually harasses a student, and a teacher complains to the school board but the school board is indifferent, the board would likely be liable for a Title IX violation. See generally *Gebser*, 524 U. S. 274. But if Title IX's private right of action does not encompass retaliation claims, the teacher would have no recourse if he were subsequently fired for speaking out. Without protection from retaliation, individuals who witness discrimination would likely not report it, indiffer-

ence claims would be short circuited, and the underlying discrimination would go unremedied.

Title IX's enforcement scheme also depends on individual reporting because individuals and agencies may not bring suit under the statute unless the recipient has received "actual notice" of the discrimination. *Id.*, at 288, 289–290 (holding that an appropriate official of the funding recipient must have actual knowledge of discrimination and respond with deliberate indifference before a private party may bring suit); 20 U. S. C. § 1682 (providing that a federal agency may terminate funding only after it "has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means"). If recipients were able to avoid such notice by retaliating against all those who dare complain, the statute's enforcement scheme would be subverted. We should not assume that Congress left such a gap in its scheme.

Moreover, teachers and coaches such as Jackson are often in the best position to vindicate the rights of their students because they are better able to identify discrimination and bring it to the attention of administrators. Indeed, sometimes adult employees are "'the only effective adversar[ies]'" of discrimination in schools. See *Sullivan, supra,* at 237 ("[A] white owner is at times 'the only effective adversary' of the unlawful restrictive covenant" (citing *Barrows* v. *Jackson,* 346 U. S. 249, 259 (1953))).

D

The Board is correct in pointing out that, because Title IX was enacted as an exercise of Congress' powers under the Spending Clause, see, *e. g., Davis, supra,* at 640; *Gebser, supra,* at 287; *Franklin,* 503 U. S., at 74–75, and n. 8, "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue," *Davis, supra,* at 640. When Congress

enacts legislation under its spending power, that legislation is "in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). As we have recognized, "[t]here can . . . be no knowing acceptance [of the terms of the contract] if a State is unaware of the conditions [imposed by the legislation on its receipt of funds]." *Ibid.*

The Board insists that we should not interpret Title IX to prohibit retaliation because it was not on notice that it could be held liable for retaliating against those who complain of Title IX violations. We disagree. Funding recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979, when we decided *Cannon*. *Pennhurst* does not preclude private suits for intentional acts that clearly violate Title IX. *Davis, supra,* at 642.

Indeed, in *Davis,* we held that *Pennhurst* did not pose an obstacle to private suits for damages in cases of a recipient's deliberate indifference to one student's sexual harassment of another, because the deliberate indifference constituted intentional discrimination on the basis of sex. *Davis, supra,* at 650. See also *Franklin, supra,* at 75 ("Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe"). Similarly, we held in *Gebser* that a recipient of federal funding could be held liable for damages under Title IX for deliberate indifference to a teacher's harassment of a student. 524 U. S., at 287–288. In *Gebser,* as in *Davis,* we acknowledged that federal funding recipients must have notice that they will be held liable for damages. See *Davis, supra,* at 642; *Gebser, supra,* at 287. But we emphasized that "this limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute." *Davis, supra,* at 642 (citing *Franklin,* 503 U. S., at 74–75). See also *ibid.* ("[T]he *[Pennhurst]* notice problem does not

arise in a case such as this, in which intentional discrimination is alleged"); *Bennett* v. *Kentucky Dept. of Ed.*, 470 U. S. 656, 665–666 (1985) (holding that there was sufficient notice under *Pennhurst* where a statute made clear that some conditions were placed on the receipt of federal funds, and stating that Congress need not "specifically identif[y] and proscrib[e]" each condition in the legislation). Simply put, "*Pennhurst* does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis, supra,* at 642.

Thus, the Board should have been put on notice by the fact that our cases since *Cannon*, such as *Gebser* and *Davis*, have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination. Indeed, retaliation presents an even easier case than deliberate indifference. It is easily attributable to the funding recipient, and it is always—by definition—intentional. We therefore conclude that retaliation against individuals because they complain of sex discrimination is "intentional conduct that violates the clear terms of the statute," *Davis*, 526 U. S., at 642, and that Title IX itself therefore supplied sufficient notice to the Board that it could not retaliate against Jackson after he complained of discrimination against the girls' basketball team.

The regulations implementing Title IX clearly prohibit retaliation and have been on the books for nearly 30 years. Cf., *e. g., id.,* at 643 (holding that Title IX's regulatory scheme "has long provided funding recipients with notice that they may be liable for their failure to respond to the discriminatory acts of certain nonagents"). More importantly, the Courts of Appeals that had considered the question at the time of the conduct at issue in this case all had already interpreted Title IX to cover retaliation. See, *e. g., Lowrey,* 117 F. 3d, at 252; *Preston,* 31 F. 3d, at 206. The Board could not have realistically supposed that, given this

context, it remained free to retaliate against those who reported sex discrimination. Cf. *Davis, supra,* at 644 (stating that the common law of torts "has put schools on notice that they may be held responsible under state law for their failure to protect students from the tortious acts of third parties"). A reasonable school board would realize that institutions covered by Title IX cannot cover up violations of that law by means of discriminatory retaliation.

To prevail on the merits, Jackson will have to prove that the Board retaliated against him *because* he complained of sex discrimination. The amended complaint alleges that the Board retaliated against Jackson for complaining to his supervisor, Ms. Evelyn Baugh, about sex discrimination at Ensley High School. At this stage of the proceedings, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer* v. *Rhodes,* 416 U. S. 232, 236 (1974). Accordingly, the judgment of the Court of Appeals for the Eleventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

The Court holds that the private right of action under Title IX of the Education Amendments of 1972, for sex discrimination that it implied in *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979), extends to claims of retaliation. Its holding is contrary to the plain terms of Title IX, because retaliatory conduct is not discrimination on the basis of sex. Moreover, we require Congress to speak unambiguously in imposing conditions on funding recipients through its spending power. And, in cases in which a party asserts that a cause of action should be implied, we require that the statute itself evince a plain intent to provide such a cause of action.

Section 901 of Title IX meets none of these requirements. I therefore respectfully dissent.

## I

Title IX provides education funding to States, subject to § 901's condition that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U. S. C. § 1681(a). Section 901 does not refer to retaliation. Consequently, the statute prohibits such conduct only if it falls within § 901's prohibition against discrimination "on the basis of sex." It does not.

A claim of retaliation is not a claim of discrimination on the basis of sex. In the context of § 901, the natural meaning of the phrase "on the basis of sex" is on the basis of the plaintiff's sex, not the sex of some other person. See *Leocal* v. *Ashcroft*, 543 U. S. 1, 9 (2004) ("When interpreting a statute, we must give words their ordinary or natural meaning" (internal quotation marks omitted)). For example, suppose a sexist air traffic controller withheld landing permission for a plane because the pilot was a woman. While the sex discrimination against the female pilot no doubt adversely impacted male passengers aboard that plane, one would never say that they were discriminated against "on the basis of sex" by the controller's action.

Congress' usage of the phrase "on the basis of sex" confirms this commonsense conclusion. Even within Title VII of the Civil Rights Act of 1964 itself, Congress used the phrase "on the basis of sex" as a shorthand for discrimination "on the basis of such individual's sex." Specifically, in ensuring that Title VII reached discrimination because of pregnancy, Congress provided that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth or related medical conditions." 42 U. S. C. § 2000e(k); cf. *California Fed.*

*Sav. & Loan Assn.* v. *Guerra,* 479 U. S. 272, 277 (1987) (describing how Congress amended Title VII to specify that sex discrimination included discrimination on the basis of pregnancy). The reference to "on the basis of sex" in this provision must refer to Title VII's prohibition on discrimination "because of such individual's . . . sex," suggesting that Congress used the phrases interchangeably. §2000e–2(a)(1). After all, Title VII's general prohibition against discriminatory employer practices does not use "[t]he terms 'because of sex' or 'on the basis of sex.'" It uses only the phrase "because of such individual's . . . sex." *Ibid.*

This Court has also consistently used the phrase "on the basis of sex" as a shorthand for on the basis of the claimant's sex. See, *e. g., United States* v. *Burke,* 504 U. S. 229, 239 (1992); *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57, 64 (1986). Thus, for a disparate-treatment claim to be a claim of discrimination on the basis of sex, the claimant's sex must have "actually played a role in [the decisionmaking] process and had a determinative influence on the outcome," *Hazen Paper Co.* v. *Biggins,* 507 U. S. 604, 610 (1993). Cf. *Teamsters* v. *United States,* 431 U. S. 324, 335, n. 15 (1977) ("'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or [other protected trait]").

Jackson's assertion that the Birmingham Board of Education (Board) retaliated against him fails to allege sex discrimination in this sense. Jackson does not claim that his own sex played any role, let alone a decisive or predominant one, in the decision to relieve him of his position. Instead, he avers that he complained to his supervisor about sex discrimination against the girls' basketball team and that, sometime subsequent to his complaints, he lost his coaching position. App. 10–11. At best, then, he alleges discrimination "on the basis of sex" founded on the attenuated connection between the supposed adverse treatment and the sex of others. Be-

cause Jackson's claim for retaliation is not a claim that his sex played a role in his adverse treatment, the statute's plain terms do not encompass it.

Jackson's lawsuit therefore differs fundamentally from other examples of sex discrimination, like sexual harassment. *Ante*, at 174–175. A victim of sexual harassment suffers discrimination because of her own sex, not someone else's. Cases in which this Court has held that § 901 reaches claims of vicarious liability for sexual harassment are therefore inapposite here. See, *e. g., Davis* v. *Monroe County Bd. of Ed.*, 526 U. S. 629, 641–649 (1999); *Gebser* v. *Lago Vista Independent School Dist.*, 524 U. S. 274, 277 (1998); *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 75 (1992). In fact, virtually every case in which this Court has addressed Title IX concerned a claimant who sought to recover for discrimination because of her own sex. *Davis, supra*, at 633–635; *National Collegiate Athletic Assn.* v. *Smith*, 525 U. S. 459, 462 (1999); *Gebser, supra*, at 277–279; *Franklin, supra*, at 63–64; *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 721 (1982); *North Haven Bd. of Ed.* v. *Bell*, 456 U. S. 512, 517–518 (1982); *Cannon*, 441 U. S., at 680. Again, Jackson makes no such claim.

Moreover, Jackson's retaliation claim lacks the connection to actual sex discrimination that the statute requires. Jackson claims that he suffered reprisal because he *complained about* sex discrimination, not that the sex discrimination underlying his complaint occurred. This feature of Jackson's complaint is not surprising, since a retaliation claimant need not prove that the complained-of sex discrimination happened. Although this Court has never addressed the question, no Court of Appeals requires a complainant to show more than that he had a reasonable, good-faith belief that discrimination occurred to prevail on a retaliation claim.[1]

---

[1] See, *e. g., Higgins* v. *New Balance Athletic Shoe, Inc.*, 194 F. 3d 252, 262 (CA1 1999); *Gregory* v. *Daly*, 243 F. 3d 687, 701 (CA2 2001); *Aman* v. *Cort Furniture Rental Corp.*, 85 F. 3d 1074, 1085 (CA3 1996); *Byers*

Retaliation therefore cannot be said to be discrimination on the basis of anyone's sex, because a retaliation claim may succeed where no sex discrimination ever took place.

The majority ignores these fundamental characteristics of retaliation claims. Its sole justification for holding that Jackson has suffered sex discrimination is its statement that "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Ante,* at 174.[2] But the sex-based topic of the complaint cannot overcome the fact that the retaliation is not based on anyone's sex, much less the complainer's sex. For example, if a coach complains to school officials about the dismantling of the men's swimming team, which he honestly and reasonably, but incorrectly, believes is occurring because of the sex of the team, and he is fired, he may prevail. Yet, he would not have been discrimi-

v. *Dallas Morning News, Inc.,* 209 F. 3d 419, 428 (CA5 2000); *Johnson* v. *University of Cincinnati,* 215 F. 3d 561, 579–580 (CA6 2000); *Talanda* v. *KFC Nat. Management Co.,* 140 F. 3d 1090, 1096 (CA7 1998); *EEOC* v. *HBE Corp.,* 135 F. 3d 543, 554 (CA8 1998); *Moore* v. *California Inst. of Technology Jet Propulsion Lab.,* 275 F. 3d 838, 845, n. 1 (CA9 2002); *Crumpacker* v. *Kansas Dept. of Human Resources,* 338 F. 3d 1163, 1171 (CA10 2003); *Meeks* v. *Computer Assoc. Int'l,* 15 F. 3d 1013, 1021 (CA11 1994); *Parker* v. *Baltimore & Ohio R. Co.,* 652 F. 2d 1012, 1019–1020 (CADC 1981); cf. *Clark County School Dist.* v. *Breeden,* 532 U. S. 268, 271–272 (2001) *(per curiam)* (where no reasonable person could have believed that the incident constituted sex harassment violating Title VII, employee could not prevail on her retaliation claim).

[2] Tellingly, the Court does not adopt the rationale offered by petitioner at oral argument. According to petitioner, "[b]ut for the discrimination on the basis of sex, he would not have complained, and . . . had he not made a complaint about sex discrimination, he would [not] have lost his [coaching] position." Tr. of Oral Arg. 8. This "but for" chain exposes the faulty premise in the position that retaliation is on the basis of sex. The first and necessary step in this chain of causation is that "discrimination on the basis of sex" occurred. Yet, retaliation claims require proving no such thing. Thus, the "but for" link articulated by counsel between "discrimination on the basis of sex" and the adverse employment action does not exist.

nated against on the basis of his sex, for his own sex played no role, and the men's swimming team over which he expressed concern also suffered no discrimination on the basis of sex. In short, no discrimination on the basis of sex has occurred.

At bottom, and petitioner as much as concedes, retaliation is a claim that aids in enforcing another separate and distinct right. Brief for Petitioner 13 (noting the relationship retaliation bears to "primary discrimination"). In other contexts, this Court has recognized that protection from retaliation is separate from direct protection of the primary right and serves as a prophylactic measure to guard the primary right. See *Crawford-El* v. *Britton,* 523 U. S. 574, 588, n. 10 (1998) ("The reason why such retaliation offends the Constitution is that it threatens to inhibit [the] exercise of the protected right").[3] As we explained with regard to Title VII's retaliation prohibition, "a primary purpose of antiretaliation provisions" is "[m]aintaining unfettered access to statutory remedial mechanisms." *Robinson* v. *Shell Oil Co.,* 519 U. S. 337, 346 (1997). To describe retaliation as discrimination on the basis of sex is to conflate the enforcement mechanism with the right itself, something for which the statute's text provides no warrant.

Moreover, that the text of Title IX does not mention retaliation is significant. By contrast to Title IX, Congress enacted a separate provision in Title VII to address retaliation, in addition to its general prohibition on discrimination. § 2000e–3(a). Congress' failure to include similar text in Title IX shows that it did not authorize private retaliation actions. This difference cannot be dismissed, as the major-

---

[3] See also *Great American Fed. Sav. & Loan Assn.* v. *Novotny,* 442 U. S. 366, 387 (1979) (White, J., dissenting) ("Clearly, respondent's right under § 704(a)—to be free from retaliation for efforts to aid others asserting Title VII rights—is distinct from the Title VII right implicated in [this] claim under § 1985(3), which is the right of women employees not to be discriminated against on the basis of their sex").

ity suggests, on the ground that Title VII is a more specific statute in which Congress proscribed particular practices, as opposed to the general prohibition here. *Ante,* at 175. The fact that Congress created those specific prohibitions in Title VII is evidence that it intended to preclude courts from implying similar specific prohibitions in Title IX.

Even apart from Title VII, Congress expressly prohibited retaliation in other discrimination statutes. See, *e. g.,* 42 U. S. C. § 12203(a) (Americans with Disabilities Act of 1990); 29 U. S. C. § 623(d) (Age Discrimination in Employment Act of 1967). If a prohibition on "discrimination" plainly encompasses retaliation, the explicit reference to it in these statutes, as well as in Title VII, would be superfluous—a result we eschew in statutory interpretation. The better explanation is that when Congress intends to include a prohibition against retaliation in a statute, it does so. See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.,* 511 U. S. 164, 176–177 (1994). Its failure to do so in § 901 is therefore telling.

## II

The Court's holding is also inconsistent with two lines of this Court's precedent: Our rule that Congress must speak with a clear voice when it imposes liability on the States through its spending power and our refusal to imply a cause of action when Congress' intent to create a right or a remedy is not evident.

## A

As the majority acknowledges, Congress enacted Title IX pursuant to its spending power. *Ante,* at 181 (citing *Davis,* 526 U. S., at 640; *Gebser,* 524 U. S., at 287; *Franklin,* 503 U. S., at 74–75, and n. 8); U. S. Const., Art. 1, § 8, cl. 1. This Court has repeatedly held that the obligations Congress imposes on States in spending power legislation must be clear. Such legislation is "in the nature of a contract" and funding recipients' acceptance of the terms of that contract must be "voluntar[y] and knowin[g]." *Pennhurst State School and*

*Hospital* v. *Halderman,* 451 U. S. 1, 17 (1981); see also *Barnes* v. *Gorman,* 536 U. S. 181, 186 (2002). For their acceptance to be voluntary and knowing, funding recipients must "have notice of their potential liability." *Davis,* 526 U. S., at 641. Thus, "[i]n interpreting language in spending legislation, we . . . 'insis[t] that Congress speak with a clear voice,'" *id.,* at 640 (quoting *Pennhurst,* 451 U. S., at 17), and a condition must be imposed "unambiguously," *ibid.; Gonzaga Univ.* v. *Doe,* 536 U. S. 273, 280 (2002); *Barnes, supra,* at 186.

The Court's holding casts aside this principle. As I have explained, *supra,* at 185–190, the statute's plain terms do not authorize claims of retaliation. The same analysis shows that, at the least, the statute does not clearly authorize retaliation claims. The majority points out that the statute does not say: "'[N]o person shall be subjected to discrimination on the basis of *such individual's* sex.'" *Ante,* at 179 (emphasis in original). But this reasoning puts the analysis backwards. The question is not whether Congress clearly excluded retaliation claims under Title IX, but whether it clearly included them. The majority's statement at best points to ambiguity in the statute; yet ambiguity is resolved in favor of the States, which must be aware when they accept federal funds of the obligations they thereby agree to assume.

The majority asserts that "the Board should have been put on notice by the fact that our cases since *Cannon,* such as *Gebser* and *Davis,* have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Ante,* at 183. *Gebser* and *Davis* did not hold or imply that Title IX prohibited "diverse forms of intentional sex discrimination"; they held that schools could be held vicariously liable for sexual harassment committed by students or teachers. See *Gebser, supra,* at 277; *Davis, supra,* at 633. There was no question that the sexual harassment in those cases was sex discrimination. See *Meritor Savings,* 477 U. S., at 64 ("Without question, when a supervisor sexually harasses a subordinate

because of the subordinate's sex, that supervisor 'discrimi-
nate[s]' on the basis of sex"). These cases hardly gave notice
to the Board here that retaliation liability loomed.

More important, the Court's rationale untethers notice
from the statute. The Board, and other Title IX recipients,
must now assume that if conduct can be linked to sex
discrimination—no matter how attenuated that link—this
Court will impose liability under Title IX. That there is a
regulation proscribing retaliation in Title IX administrative
enforcement proceedings is no answer, *ante*, at 183, for it
says nothing about whether retaliation is discrimination on
the basis of sex, much less whether there is a private cause
of action for such conduct. Rather than requiring clarity
from Congress, the majority requires clairvoyance from
funding recipients.

B

Even apart from the clarity we consistently require of obli-
gations imposed by spending power legislation, extending
the cause of action implied in *Cannon* to Jackson's claim con-
tradicts the standard we have set for implying causes of ac-
tion to enforce federal statutes. Whether a statute supplies
a cause of action is a matter of statutory interpretation.
See *Touche Ross & Co.* v. *Redington*, 442 U. S. 560, 568
(1979). We must examine whether the statute creates a
right. That right "must be phrased in terms of the per-
son benefited." *Gonzaga, supra*, at 284 (internal quotation
marks omitted); see also *Virginia Bankshares, Inc.* v. *Sand-
berg*, 501 U. S. 1083, 1102, 1103 (1991). And our inquiry is
not merely whether the statute benefits some class of people,
but whether that class includes the plaintiff in the case be-
fore us. Our role, then, is not "'to provide such remedies as
are necessary to make effective the congressional purpose'
expressed by a statute," but to examine the text of what
Congress enacted into law. *Alexander* v. *Sandoval*, 532
U. S. 275, 287 (2001) (quoting *J. I. Case Co.* v. *Borak*, 377 U. S.

426, 433 (1964)); *Virginia Bankshares, supra,* at 1102; *Touche Ross & Co., supra,* at 578. If the statute evinces no intent to create a right for the plaintiff in the case before us, we should not imply a cause of action.

This Court has held that these principles apply equally when the Court has previously found that the statute in question provides an implied right of action and a party attempts to expand the class of persons or the conduct to which the recognized action applies. *Virginia Bankshares, supra,* at 1102. More specifically, this Court has rejected the creation of implied causes of action for ancillary claims like retaliation. In *Central Bank,* we concluded that § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 15 U. S. C. § 78j, provided no civil action against those who aid and abet individuals engaging in manipulative or deceptive practices, though the respondents urged that such a claim was necessary to fulfill the statute's protection against deceit in the securities marketplace. 511 U. S., at 177, 188. We declined to do so even though this Court had implied a cause of action for § 10(b). See *Borak, supra.* In our view, while the statute's language potentially reached the conduct of some aiders and abettors, the full scope of liability for aiding and abetting would have extended liability beyond the conduct prohibited by the statute. *Central Bank,* 511 U. S., at 176. We surveyed other statutes and found that "Congress knew how to impose aiding and abetting liability when it chose to do so." *Id.,* at 176–177. Our view that the statute did not reach aiding and abetting was also confirmed by the fact that an "element critical for recovery" in actions against those engaging in fraudulent and manipulative acts was not required in proving that someone had aided and abetted such persons. *Id.,* at 180.

The same reasons militate equally against extending the implied cause of action under Title IX to retaliation claims. As in *Central Bank,* imposing retaliation liability expands the statute beyond discrimination "on the basis of sex" to

instances in which no discrimination on the basis of sex has occurred. Again, § 901 protects individuals only from discrimination on the basis of their own sex. *Supra*, at 185–187. Thus, extending the implied cause of action under Title IX to claims of retaliation expands the class of people the statute protects beyond the specified beneficiaries. As with the absence of aiding and abetting from the statute at issue in *Central Bank*, I find it instructive that § 901 does not expressly prohibit retaliation, while other discrimination statutes do so explicitly. And like the aiding and abetting liability in *Central Bank*, prevailing on a claim of retaliation lacks elements necessary to prevailing on a claim of discrimination on the basis of sex, for no sex discrimination need have occurred.

The majority's reliance on *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969), is wholly misplaced. *Ante*, at 176–177. Rather than holding that a general prohibition against discrimination permitted a claim of retaliation, *Sullivan* held that a white lessor had standing to assert the right of a black lessee to be free from racial discrimination pursuant to Rev. Stat. § 1978, 42 U. S. C. § 1982. 396 U. S., at 237 ("[T]here can be no question but that Sullivan has standing to maintain this action" (citing *Barrows* v. *Jackson*, 346 U. S. 249 (1953), a standing case)).[4] To make out his third-party claim on behalf of the black lessee, the white lessor would necessarily be required to demonstrate that the defendant had discriminated against the black lessee on the basis of race. Jackson, by contrast, need not show that the sex discrimination forming the basis of his complaints actually occurred. Thus, by recognizing Jackson's claim, the majority creates an entirely new cause of action for a secondary rights holder, beyond the claim of the original rights holder, and

---

[4] Title 42 U. S. C. § 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

well beyond *Sullivan*. In any event, *Sullivan* involved § 1982, a statute enacted pursuant to Congress' Thirteenth Amendment enforcement power, *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 437–438 (1968), not its spending power. *Sullivan* therefore says nothing about whether Title IX clearly conditions States' receipt of federal funds on retaliation liability.

### III

The Court establishes a prophylactic enforcement mechanism designed to encourage whistle-blowing about sex discrimination. The language of Title IX does not support this holding. The majority also offers nothing to demonstrate that its prophylactic rule is necessary to effectuate the statutory scheme. Nothing prevents students—or their parents—from complaining about inequality in facilities or treatment. See, *e. g., Franklin,* 503 U. S., at 63 (student brought suit); *Davis,* 526 U. S., at 633 (suit brought by minor's parent). Under the majority's reasoning, courts may expand liability as they, rather than Congress, see fit. This is no idle worry. The next step is to say that someone closely associated with the complainer, who claims he suffered retaliation for those complaints, likewise has a retaliation claim under Title IX. See 2 Equal Employment Opportunity Commission, Compliance Manual § 8–II, p. 8–10 (1998) ("[I]t would be unlawful for a respondent to retaliate against an employee because his or her spouse, who is also an employee, filed an EEOC charge").

By crafting its own additional enforcement mechanism, the majority returns this Court to the days in which it created remedies out of whole cloth to effectuate its vision of congressional purpose. In doing so, the majority substitutes its policy judgments for the bargains struck by Congress, as reflected in the statute's text. The question before us is only whether Title IX prohibits retaliation, not whether prohibiting it is good policy. *Central Bank, supra,* at 177. For

the reasons addressed above, I would hold that § 901 does not encompass private actions for retaliation. I respectfully dissent.