**Jerald BOYKIN**

v.

**CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE, et al.**

**Civil Action No. 03–41–FJP–SCR.**

United States District Court, M.D. Louisiana.

July 11, 2006.

Randolph Alexander Piedrahita, Due', Price, Guidry, Piedrahita & Andrews, Jill Leininger Craft, Baton Rouge, LA, for Jerald Boykin.

Michael A. Patterson, Jennifer J. Vosburg, Jamie Hurst Watts, Long Law Firm, LLP, Murphy James Foster, III, Yvonne Reed Olinde, Breazeale, Sachse & Wilson, Baton Rouge, LA, for City of Baton Rouge/Parish of East Baton Rouge, et al.

## RULING ON RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

POLOZOLA, District Judge.

This matter is before the Court on defendants' Renewed Motion for Summary Judgment [1] and the Court's order to brief the applicability of *Garcetti v. Ceballos.* [2] The issue before the Court is whether plaintiff's First Amendment Free Speech retaliation claim must be dismissed under the recent United States Supreme Court ruling in *Garcetti v. Ceballos.*

In response to the Court order and in support of their motion for partial summary judgment, defendants argue that plaintiff drafted the diversification report as part of his duties as Director of Human Resources. Defendants contend the content of the report at issue was workforce diversification, a matter within the scope of Boykin's duties as Human Resources Director. Thus, defendants argue that the facts of this case fall squarely within the mandates of the *Garcetti* ruling, and summary judgment should be granted in favor of the defendants on the First Amendment Free Speech retaliation claim.

The plaintiff notes in his response that the Court's Ruling on Motion for Summary Judgment of April 7, 2004, found that Boykin made his claims both as a citizen and as a government employee, which plaintiff argues distinguishes it from *Garcetti.* Plaintiff further argues that the defendants have repeatedly claimed that Boykin was not authorized to create the report at issue, he had no authority to speak on behalf of the Mayor's office, and his drafting the report was not part of his official duties. Thus, plaintiff contends that *Garcetti* is distinguishable and that this is a matter of pure First Amendment protected speech by a citizen acting outside the scope of his employment duties. The Court disagrees with plaintiff's arguments and finds that *Garcetti* is applicable under the facts of this case.

### Discussion of Garcetti v. Ceballos

In *Garcetti v. Ceballos,* a deputy district attorney alleged that he was subjected to adverse employment actions in retaliation for engaging in protected speech, *i.e.,* for writing a disposition memorandum in which he recommended dismissal of a case based on purported governmental misconduct. The United States Supreme Court held that, "**[w]hen public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.**" [3]

The Court noted that public employees are still citizens with First Amendment speech rights, stating that, "[s]o long as employees are speaking about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." [4]

---

1. Rec. Doc. No. 157.

2. —— U.S. ——, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

3. *Id.,* at 1953. (Emphasis added).

4. *Id.,* citing *e.g., Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

However, the Court continued that the proper application of its precedents called for the conclusion that "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities."[5] The Court further stated as follows:

> The dispositive factor here is not that Ceballos expressed his views inside his office, rather than publicly, see, e.g., Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619, nor that the memo concerned the subject matter of his employment, see, e.g., Pickering, 391 U.S., at 573, 88 S.Ct. 1731, 20 L.Ed.2d 811. Rather, **the controlling factor is that Ceballos' expressions were made pursuant to his official duties.** That consideration distinguishes this case from those in which the First Amendment provides protection against discipline. Ceballos wrote his disposition memo because that is part of what he was employed to do. He did not act as a citizen by writing it. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe on any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. Cf. Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700.[6]

⬛ The Court explained that in instances where a court determines that an employee spoke as a citizen on a matter of public concern, **the possibility** of a First Amendment claim arises. However, the Court further stated that,

> [t]he question becomes whether the relevant government entity had an adequate justification for treating· the employee differently from any other member of the general public. See Pickering, 391 U.S., at 568, 88 S.Ct. 1731, 20 L.Ed.2d 811. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.[7]

Thus, simply because a court may find that a government employee spoke as a citizen on a matter of public concern does not end the inquiry. A court must then ask the questions set forth above to determine the validity of a First Amendment Free Speech retaliation claim, balancing the employee's speech against the interests of the governmental entity as they relate to the employee's speech.

The Supreme Court acknowledged that its employee-speech jurisprudence protects the constitutional rights of public employees, but also noted that, "[u]nderlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.' "[8]

Specifically, the Supreme Court noted that the fact that Ceballos "spoke as a

---

5.  Id.

6.  Id. (Emphasis added).

7.  Id., at 1957.

8.  Id., at 1959, (quoting Connick, 461 U.S., at 154, 103 S.Ct. 1684, 75 L.Ed.2d 708).

prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case" distinguished Ceballos' case from those where the First Amendment provides protection from employee discipline.[9] The Court further explained:

> Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. **It is immaterial whether he experienced some personal gratification from writing the memo;** his First Amendment rights do not depend on his job satisfaction. **The significant point is that the memo was written pursuant to Ceballos' official duties.** . . . Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. **In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee.** The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.[10]

The Court also addressed the fact that government employers have a significant interest in controlling speech made by an employee in his or her professional capacity. The Court stated as follows:

> Official communications have official consequences, creating a need for substantive consistency and clarity. **Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.** Ceballos' memo is illustrative. It demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff's department. **If Ceballos' superiors thought his memo was inflammatory or misguided, they had the authority to take proper corrective action.**[11]

The Court did note that in the *Garcetti* case, the parties did not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. Thus, the Court stated that it "ha[s] no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."[12]

### Application of Garcetti to the Boykin Report

■ In the case before the Court, plaintiff has noted in his Opposition to the Renewed Motion for Summary Judgment[13] that the diversification report was not drafted pursuant to his employment duties. Plaintiff also argues in his Opposition that because the defendants have repeatedly argued that Boykin was "not authorized" to speak, had no authority to speak, and creating and disseminating his report were not part of his official duties, *Garcetti* is inapplicable to this case. However, the record and the briefs submitted to the Court do not support plaintiff's contention.

First, plaintiff specifically acknowledged in his Summary of Argument,[14] that in

9. *Id.,* at 1960.

10. *Id.* (Emphasis added).

11. *Id.,* at 1960–61. (Emphasis added).

12. *Id.,* at 1961–62.

13. Rec. Doc. No. 161.

14. Rec. Doc. No. 128, p. 6.

paragraph 19 of defendants' Answer, the plaintiff was requested by the Mayor to draft a report on diversity in accordance with his duties as Human Resources Director. Furthermore, while the defendants have argued that the **manner** in which plaintiff drafted and disseminated the diversification report was unauthorized, they have also repeatedly stated that the **subject matter** of the report was precisely within the scope of plaintiff's job duties as Human Resources Director. It is important that the Court summarize the statements and arguments made in defendants' briefs, to crystallize the defendants' position on this issue:

· "The task of diversifying the workforce was discussed by the Mayor and his administration at department head meetings in early 2001, and Mr. Boykin was specifically given the charge of undertaking this goal."[15]

· Plaintiff was not terminated because he asserted complaints of discrimination, "but because of the **manner** in which he drafted and disseminated his report and his failure to properly conduct investigations of and remedy discriminatory complaints."[16]

· "The content of Mr. Boykin's speech was workforce diversification, solely related to his job as Human Resources Director."[17]

· "Mr. Boykin' s termination was not due to the **content** of or fact that he drafted a report regarding diversity. Indeed, at the time the Mayor took office, he instructed Plaintiff to take the initiative of the Mayor's goal to diversify the City–Parish workforce, including recommendations and a plan for eliminating disparities in pay."[18]

It is not necessary for the Court to rule on the accuracy of the content of the diversification report. However, the Court does find as a matter of law under the facts of this case that such a report was clearly contemplated by the Plan of Government describing the position of Human Resources Director.[19] Defendants have always alleged that it was the **manner** in which the report was drafted, followed by the plaintiff's alleged secrecy and his alleged clear intent to circumvent any opportunity for the Mayor to make changes and/or corrections to the report prior to it being made public, which constituted the reason for plaintiff's termination.

Furthermore, based on the allegations of all parties, the Court believed and found that the report was drafted pursuant to plaintiff's official duties as Human Resources Director, which is evidenced by the following statements:

· The Court's April 7, 2004, Ruling[20] recognized that the diversification report at issue was created pursuant to Boykin's duties as Director of Human Resources, stating about Boykin: "In 1989, he was appointed Human Resources Director. Plaintiff alleges that he was asked to provide a briefing to Mayor Simpson and his transition team. During the briefing, plaintiff alleges that he informed the

---

**15.** Defendants' Memorandum in Support of Motion for Summary Judgment, Rec. Doc. No. 104, p. 12.

**16.** Defendant's Memorandum in Support of Motion for Summary Judgment, Rec. Doc. No. 104, p. 35. (Emphasis added).

**17.** Defendants' Memorandum in Support of Motion for Summary Judgment, Rec. Doc. No. 104, p. 44.

**18.** Defendants' Supplemental Memorandum in Support of Motion for Summary Judgment, Rec. Doc. No. 129, p. 9. (Emphasis added).

**19.** *See,* Exhibit D to Defendants' Memorandum in Support of Motion for Summary Judgment, Boykin Deposition.

**20.** Rec. Doc. No. 100.

mayor of the lack of diversity 'at the top' of City–Parish government and of the disparities in pay for minorities."[21]

· With respect to plaintiff's free speech claim, the Court also stated as follows in its April 7, 2004 Ruling: "Plaintiff relies on *Branton v. City of Dallas* to support the argument that **he could speak on such a matter because he was charged with the responsibility of investigating and reporting violations of the federal and state anti-discrimination laws as Human Resources Director.**"[22]

Thus, based on the allegations and exhibits presented by all of the parties in this matter, the Court was clearly of the opinion at the time of its April 7, 2004 Ruling, as it is now, that the plaintiff drafted the diversification report at issue pursuant to his duties as Human Resources Director.

It must also be noted that several cited portions of the *Garcetti* opinion are **directly** applicable to the facts of this case. The *Garcetti* court made clear that it did not matter that Ceballos had expressed his views inside his office rather than making them publicly, and it also did not matter that the memo concerned the subject matter of his employment. The Supreme Court stated that "the controlling factor is that Ceballos' expressions were made pursuant to his official duties."[23] Considering these factors, if Boykin drafted the diversification report pursuant to his official duties, as the Court has and now finds, *Garcetti* will apply. Considering that Boykin was charged with investigating, reporting, and making recommendations on diversity within the job force, and the fact

that the report contained content of this subject matter, irrespective of its accuracy, shows that the report was drafted pursuant to Boykin's official duties as Human Resources Director.

As was the case in *Garcetti*, the fact that Boykin himself felt personally discriminated against is of no consequence. The Supreme Court in *Garcetti* noted that "[i]t is immaterial whether he [Ceballos] experienced some personal gratification from writing the memo; . . ."[24] Although Boykin may have had some ulterior motive in drafting the diversification report and disseminating it in a manner that he knew would bring embarrassment to the Mayor's office, he was still operating in his official capacity as Human Resources Director, and the content of the Report was entirely consistent with the nature of the responsibilities that he was charged with in his official capacity.

Plaintiff has also clearly misstated the Court's findings in its April 7, 2004 Ruling. The Court held in its earlier opinion that the plaintiff spoke as both a citizen on a matter of public concern (race discrimination) *and* in his capacity as a government employee.[25] Plaintiff states in his Opposition that, "this Court has already definitively determined that Mr. Boykin's speech was also in his capacity as a citizen and not pursuant to his official duties, *Garcetti* changes nothing."[26] This is clearly **NOT** what the Court held. In any event, after considering the holding in *Garcetti* and the facts of this case, it is clear that Boykin was acting within his official duties as a

---

21. Rec. Doc. No. 100, p. 27.

22. ˙ Rec. Doc. No. 100, p. 28. (Emphasis added).

23. *Garcetti*, —— U.S. at ——, 126 S.Ct. at 1953, 164 L.Ed.2d at 689.

24. *Id.*, at 1960.

25. April 7, 2004 Ruling, Rec. Doc. No. 100, 29.

26. Plaintiff's Opposition to Renewed Motion for Summary Judgment, Rec. Doc. No. 161, p. 3.

public employee and thus, has no viable claim under the First Amendment.

It is important to note that this Court's prior ruling that Boykin may have also spoken as a citizen does not automatically insulate his speech under the First Amendment. As set forth previously in this Ruling, the *Garcetti* Court stated that when a court finds that a public employee speaks as a citizen on a matter of public concern, *the possibility* of a First Amendment claim arises. But the Court further explained that courts are required to determine "whether the relevant government entity had an adequate justification for treating the employee differently ..."[27] Thus, although the Court ruled in April of 2004 that the plaintiff spoke as both a citizen and a public employee, the Court must look to the interests of the government entity and its interests in plaintiff's speech before determining that the speech is automatically protected by the First Amendment. Based on the facts of this case, the defendants "had an adequate justification for treating" Boykin differently.

The *Garcetti* Court noted that, "[s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission."[28] In precisely the same way, the Court finds that the Mayor's office had the right and indeed the responsibility to analyze and investigate the contents of plaintiff's report prior to such allegations being made public. The record is replete with defendants' testimony that they did not have the opportunity to respond and make corrections or explanations for the data included in plaintiff's report.

The *Garcetti* Court also stated that, "[i]f Ceballos' superiors thought his memo was inflammatory or misguided, they had the authority to take proper corrective action."[29] Considering the contents of the report and the manner of dissemination of the report at issue, the Court finds that the report was clearly contentious and caused great conflict and the need for "damage control" by the Mayor's office. The Court further finds that this diversification report had the exact same intended effect on the Mayor's office as Ceballos' memo affected his employer's office. The defendants were justified in finding that Boykin's report and the manner in which it was distributed was inflammatory and misguided, and thus had the authority to take proper corrective action.

### Conclusion

For the reasons set forth above, plaintiff's First Amendment Free Speech retaliation claim must be dismissed under *Garcetti v. Ceballos*. Therefore, defendant's motion for summary judgment should be granted on this claim. Having dismissed the First Amendment Free Speech retaliation claim, the only claims which remain to be tried are plaintiff's claim of racial harassment under Title VII and plaintiff's claim of retaliation under Title VII, specifically under 42 U.S.C. § 2000e–3(a)[30] and the Supreme Court's holding in *Sullivan v.*

---

**27.** *Garcetti*, S.Ct., —— U.S. ——, 126 S.Ct. 1951, at 1953, 164 L.Ed.2d 689.

**28.** *Id.*, at 1960–61

**29.** *Id.*

**30.** "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Little Hunting Park, Inc.*[31] that retaliation claims extend to those who oppose discrimination against others.[32]

IT IS SO ORDERED.

---

**31.** 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

**32.** *See also Jackson v. Birmingham Bd. Of Educ.,* 544 U.S. 167, 180, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).