**KELSEY–HAYES COMPANY, a Delaware Corporation, Plaintiff,**

v.

**Ali MALEKI, Defendant.**

No. 90–72355.

United States District Court,
E.D. Michigan, S.D.

June 24, 1991.

Richard E. Rassel, Leonard M. Niehoff, Butzel Long Gust Klein & Van Zile, Detroit, Mich., for plaintiff.

James K. Robinson, Gerard Mantese, Honigman Miller Schwartz & Cohn, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiff Kelsey–Hayes has filed this action to enforce a clause barring future competitive employment which had been included in an Employment Agreement. Defendant, the former employee who had signed the agreement, has removed the case to this Court from the Circuit Court for the County of Washtenaw, pursuant to 28 U.S.C. § 1441. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332, as Kelsey–Hayes is a Delaware Corporation with its principal place of business in Michigan, and Maleki is a citizen of Ohio. This opinion constitutes the findings of fact and the conclusions of law of the Court, after trial to the bench.

Defendant Ali Maleki graduated from Saginaw Valley State University in 1988 with a Bachelor of Science degree in Electrical Engineering. Immediately following graduation Defendant worked for approximately one year as an outside contractor with Dow Chemical Company programming and networking personal computers. Defendant then accepted a job with Kelsey–Hayes at its Ann Arbor Research and Development center, at the rate of $31,800 per annum, as an entry level microprocessor programmer. He worked there from July 31, 1989 through June 7, 1990.

The Ann Arbor center was devoted to research and development of hydraulic anti-lock braking systems (ABS) for automobiles, light trucks, and vans. The engineers employed there were either systems engineers, who generated complex and lengthy mathematical flow charts of algorithms of the physical phenomena involved in acceleration, braking and deceleration; or they were computer programmers such as Maleki, who translated the flow charts into a standard National Semiconductor chip code, utilizing published users guides or manuals which were proprietary to the computer language manufacturer, and not to Kelsey–Hayes. There was no formal training given to Maleki in his responsibilities, but he was instructed to ask for the assistance of a more senior programmer when difficulties occurred, and indeed they often did. Maleki was not required to, and undisputedly did not, understand the substance of the flow charts, of the algorithms, or of braking systems.

Soon after he started work Defendant signed, inter alia, a one-page Employment Agreement. The form provides, in relevant part, that he agreed:

> 2. Not to accept with another employer or in any way compete with the Company in the same or similar Field of ABS for a period of two (2) years from the date the employment with the Company is terminated.

Defendant's immediate supervisor was Thomas Atkins, Chief Engineer of Software Development at the Research Center. On January 9, 1990, about five months after defendant had started work, and after several expressions of dissatisfaction, Mr. Atkins placed him on probation because of his inability to master the computer code. At the time, Atkins placed defendant under the tutelage of another programmer and suggested that he look for another job, because he didn't want "to hit you between the eyes" with an unexpected discharge later on.

Following that advice, defendant began an intensive five-month job search and ultimately found the job which is here in dispute. In May of 1990 Atkins told him that he was no longer probationary, but he continued with his plans to move, because he no longer felt secure at Kelsey–Hayes, and wanted to make a fresh start. When he advised Atkins that he would be leaving to work for Allied Signal Bendix Heavy Vehicle Systems Group (Allied), in Akron, Ohio, for another programming job in their research work on air brakes for heavy vehicles, Atkins told him that he, himself, had once worked on air brakes, and that they were "two different animals."

Atkins told Robert Sullivan, Vice President for Kelsey–Hayes' Research and Development and Director of the Ann Arbor facility, of defendant's move, and Sullivan was less sanguine on the subject. Sullivan met with defendant and advised him that the new job would violate the Employment agreement which he had signed. Defendant nevertheless went to work at Allied on June 8, 1990, and this lawsuit ensued. This court denied Kelsey–Hayes' motion for preliminary injunction pending trial of the matter.

■■■ Kelsey–Hayes had drafted the form Employment Agreement which defendant signed, and the agreement is clear and unambiguous on its face. It precludes defendant from work in *the same or similar field* of ABS for two years after leaving plaintiff. Although both the agreement and the facts elicited at trial make clear that there are fields of ABS other than that in which plaintiff's research center is engaged, and that all are not similar, plaintiff argues that defendant is precluded from his present employment first because the agreement must be interpreted to preclude all fields of ABS, and second because defendant's employment at Allied is in a similar field. The court finds, on the facts presented, that it must reject both arguments and that the agreement does not preclude defendant's present employment, by its plain terms.

First, unambiguous agreements must be enforced as they are written, *S.C. Gray, Inc. v. Ford Motor Co.*, 92 Mich.App. 789, 286 N.W.2d 34 (1971). *Britton v. John Hancock Mutual*, 30 Mich.App. 566, 186 N.W.2d 781 (1979). This agreement is unambiguous. Even if it were not, however it is well settled that the language of contracts must be construed against the interest of the drafter. *Higgins v. Lawrence*, 107 Mich.App. 178, 309 N.W.2d 194 (1981). This contract, therefore, may not be given the strained interpretation which plaintiff here seeks to impose against its former employee. It does not preclude employment in ALL fields of ABS.

The testimony also demonstrated clearly that all fields of ABS are not the same, or even similar, and that defendant is not employed at Allied in a same or similar field. Kelsey–Hayes' research is on development of hydraulic ABS for passenger cars and light vehicles, whereas the Allied research at the Akron Bendix Division is on air brake systems for heavy trucks. As Mr. Atkins told defendant, they are "two different animals."

Indeed, Plaintiff's Vice President for Research and Development, Mr. Sullivan, ad-

mitted in his testimony that there are at least four fields of ABS. He divided the fields into anti-lock brake systems for aircraft, anti-lock brake systems for heavy vehicles, anti-lock brake systems for passenger cars and light trucks, and anti-lock brake systems for motorcycles. Plaintiff's Atkins added a fifth category which would include anti-lock systems for railway locomotives, and admitted in his testimony that there are indeed major differences between these types of systems. Every witness who testified agreed that there are several different fields of ABS.

Defendant's witness Ralph Eslinger, a Systems Engineer for Bendix Heavy Vehicle Group testified that the Bendix Division in Akron works only on air brake systems, only on heavy vehicles, and that very significant differences exist between air versus hydraulic systems, as well as those for light versus heavy vehicles, which render the two enterprises vastly dissimilar. The heavy vehicle systems also require different research and products because of the suspension dynamics involved. Not one witness testified that these two fields of ABS are the same or similar.

Plaintiff further argues that, because defendant has visited the Allied test driving track at its South Bend, Indiana, facility, where light vehicles are also test driven, he has contact with light vehicle research, and is therefore employed in a similar field. It also argues that, as the Allied 1989 Annual Report announces an expanded corporate-wide communications network which puts Allied directly into contact with the computer systems of the company's major automotive manufacturer customers, defendant Maleki is placed into contact with and employed in same or similar fields of ABS. There is not a scintilla of evidence, however, that either of these connections has ever, or could have, placed Maleki into any contact with research concerning light vehicles. Maleki is employed by the Akron Bendix Heavy Vehicle Group. Any light vehicle hydraulic research which Allied may be conducting, and none has been identified, would have to be conducted at the Allied Division in South Bend, Indiana, according to Mr. Eslinger.

Plaintiff's Mr. Sullivan also testified that, since defendant's departure, Kelsey-Hayes has begun to work on hydraulic systems for heavy vehicles. It is argued, therefore, that defendant is employed in a same or similar field. That argument must fail, because it is not defendant who moved to a similar field, according to that testimony, but plaintiff which is changing fields after his departure. That is not evidence that defendant has breached his promise.

It is noteworthy, finally, on the question of similarity of fields and the danger of transfer of Kelsey-Hayes' proprietary research data to a competitor, that of the sixteen engineers at the Kelsey-Hayes Research Center only two, and those the most junior, have been required to sign the non-compete agreement. Neither Sullivan nor Atkins nor any of the more highly skilled and paid systems engineers who design and comprehend the algorithms which defendant programmed have been required to make such a promise. They are free to leave and work where they wish. Not one, however, has left to work for Allied-Bendix, or heavy vehicle air brake research. If Allied were seeking the proprietary research product of Kelsey-Hayes, it would seem that the choice of plaintiff is an unlikely and inconvenient one through whom to obtain it.

At the Kelsey-Hayes facility, only the systems engineers had the capability to design algorithm flow charts. A typical flow chart is approximately 80 pages in length, and Mr. Sullivan testified that it is impossible to commit one to memory. Defendant Maleki worked on the computer coding of three such charts during the term of his employment, all three of which have become outdated since then. Sullivan acknowledged that defendant could not design one, understand one, or recreate one. Indeed, he had difficulty in learning the computer language to encode them.

It must be recalled that the only knowledge which defendant was required to master at Kelsey-Hayes was the computer code published in his microprocessor manuals for use with the National Semiconduc-

tor chip. He was given no formal training even in that area by Kelsey–Hayes, but was instructed to learn from the more senior microprocessors, and had great difficulty doing so. He never, therefore, had *meaningful* access to (i.e. the ability to comprehend) any Kelsey–Hayes proprietary research data; the algorithms generated by the systems engineers.

■ Covenants not to compete in future employment were not permitted at all in Michigan until 1987, when the following was enacted, at M.C.L. § 445.774a.

> Sec. 4a. (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. Mich.Comp.Laws § 445.774a (1987).

Clearly, if the agreement which plaintiff obtained from Ali Maleki is given the strained and broadened interpretation sought by plaintiff here, it must run afoul of this law. If the Agreement is read to extend beyond Kelsey–Hayes "reasonable competitive business interests", it may not be enforced. If this court were to interpret it (despite its unambiguity) to preclude *all* fields of ABS because all are similar, as it must to include such a dissimilar field as he has now entered, it would extend beyond the reasonable competitive interests of Kelsey–Hayes. Indeed, those interests do not extend to one performing Maleki's function, at his level of comprehension at any rate. He undisputedly did not obtain any of plaintiff's proprietary information.

Michigan law on such covenants prior to 1987 was that:

> "[a]ll agreements and contracts by which any person, copartnership or corporation promises or agrees not to engage in any avocation, employment, pursuit, trade, profession or business, whether reasonable or unreasonable, partial or general, limited or unlimited, are hereby declared

to be against public policy and illegal and void." *M.C.L.* § 445.761; *M.S.A.* § 28.61.

The advance made by the 1987 enactment clearly does not remove such covenants from disfavored status, and narrowly limits them to "reasonableness" in protecting only a competitive interest, duration, geographic area, and type of employment. It is not reasonable to place as stringent a tie on an entry level computer programmer as might be placed upon a system designer, nor does a competitive interest in protecting its data extend so far as to permit Kelsey–Hayes to prohibit defendant from his "type of employment" as programmer of a nationally marketed computer language.

In the case of *Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394, 362 N.W.2d 676 (1984) Justin Levin's opinion is helpful as to the state of the law in this area prior to the 1987 Michigan authorizing statute. *Follmer* was a case in which a former employee accountant had promised to compensate his employer for any clients taken on departure; and the court remanded for factual development as to whether the employee had access to confidential information from his employer which had enabled him to win the patronage of those particular clients who did go to him. It held that an employer, even under the old statute, had the right to protect itself from loss of business through use of its own confidential information. *Follmer* did not, of course, permit a preclusion from employment, nor did it even require payment on the simple terms of the covenant. It required an inquiry as to whether the employer's secrets had been used to take his customers. It states, instructively, that:

> "It has been uniformly held that general knowledge, skill, or facility acquired through training or experience while working for an employer appertain exclusively to the employee. The fact that they were acquired or developed during the employment does not, by itself, give the employer a sufficient interest to support a restraining covenant, even though the on-the-job-training has been exten-

sive and costly." "*Blake*, Employment Agreements Not to Compete, 73 Harvard Law Review 625, 652, (1960)." 420 Mich. at 402, footnote 4.

So in this case, whatever expertise defendant developed as a computer programmer at Kelsey–Hayes, with the assistance of on-the-job instruction and published manuals, has been his alone, historically, and would not fall within the proscription of contracts protecting an employer's propriety or confidential information.

Since our 1987 statute, "reasonable competitive business interests" have not been defined by Michigan courts; but the decisions of other jurisdictions are helpful, particularly in light of our history. They suggest that the logic of *Follmer*, concerning the difference between skills and secrets still controls, even where covenants are fully enforced.

Particularly apposite is the case of *Hasty v. Rent–A–Driver, Inc.*, 671 S.W.2d 471 (Tenn.1984), in which the Supreme Court of Tennessee considered the promise of a truck driver to "refrain from accepting or soliciting any employment of the type performed by Rent–A–Driver ... from any account ... to which Rent–A–Driver has in the past or is presently providing transportation labor." In refusing to enforce that covenant, the court noted that such covenants, although not invalid, are not favored in Tennessee and that the modern trend is to construe them favorably to the employee. "The ubiquitous question of reasonableness" must be answered through examination of a number of factors, it wrote. Those elements were held to include the consideration supporting the agreement, the economic hardship imposed on the employee, the public interest, and whether the employer has a legitimate business interest for the protection of which a restrictive covenant is *reasonable*. Such an interest must be something greater than mere competition, because a prohibition of all competition is in restraint of trade. To be reasonable, a covenant must protect against an employee gaining some unfair advantage in competition with his employer. Reasonable covenants may protect such legitimate interests as trade secrets, confidential information, close contact with the employer's customers or customer lists, or cost factors and pricing. An employer may *not* reasonably prohibit future use of general knowledge or skill. On those considerations, and as the employer claimed it was protecting its work force although it lost less than 9% of its drivers to competitors annually, the Tennessee court refused to enforce the *Hasty* covenant.

Application of the standards outlined above compels this court to conclude that, even if it were to interpret Maleki's contractual promise to encompass his present work as a matter of fact, a promise that broad must fail as a matter of law. Neither the $31,000 salary nor the total lack of job security he was given were sufficient consideration for a promise so onerous, nor is it necessary to protect any reasonable business interest of Kelsey–Hayes because, as discussed above, defendant learned nothing more than a nationally published computer code, and had no contact with customers, lists, prices, or any other information which might furnish him with some unfair advantage over his former employer. He was exposed to the algorithms, but undisputedly could not comprehend or recreate them.

Accordingly, for all of the reasons outlined above, it is ordered that the plaintiff's complaint be dismissed.