**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-1794**

M. MARK COLE,

            Plaintiff – Appellant,

      v.

CHAMPION ENTERPRISES, INCORPORATED; SOUTHERN SHOWCASE
HOUSING, INCORPORATED,

            Defendants – Appellees,

      and

THE CHAMPION ENTERPRISES, INCORPORATED CORPORATE OFFICERS
STOCK PURCHASE PLAN; THE CHAMPION ENTERPRISES, INCORPORATED
DEFERRED COMPENSATION PLAN,

            Defendants.

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham.  William L. Osteen,
Senior District Judge.  (1:05-cv-00415-JAB)

Argued: October 29, 2008          Decided: December 30, 2008

Before KING, GREGORY, and SHEDD, Circuit Judges.

Affirmed by unpublished opinion.  Judge Shedd wrote the opinion,
in which Judge King and Judge Gregory joined.

**ARGUED:** J. Alexander S. Barrett, HAGAN, DAVIS, MANGUM, BARRETT,
LANGLEY & HALE, P.L.L.C., Greensboro, North Carolina, for

Appellant. James Donald Cowan, Jr., ELLIS & WINTERS, L.L.P., Greensboro, North Carolina, for Appellees. **ON BRIEF:** D. Beth Langley, Jason B. Buckland, HAGAN, DAVIS, MANGUM, BARRETT, LANGLEY & HALE, P.L.L.C., Greensboro, North Carolina, for Appellant. Dixie T. Wells, SMITH MOORE, L.L.P., Greensboro, North Carolina; David C. Wright, III, Julian H. Wright, Jr., Pearlynn Houck, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Appellees.

———————————

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

Mark Cole appeals the district court's grant of summary judgment in favor of Champion Enterprises, Inc. and Southern Showcase Housing, Inc. ("SSH")(collectively, "Champion") on his breach of contract, North Carolina Wage and Hour Act, illegal restraint of trade, and ERISA claims, as well as the district court's dismissal of his unfair trade practices claim.[1] For the following reasons, we affirm.


I


Champion is a publicly traded manufactured housing producer.[2] In 1998, it purchased SSH and entered into a written five-year employment agreement with Cole (the "January 1998 Agreement"). Among other things, the January 1998 Agreement set Cole's salary, incentive bonuses, and severance package. Later that year Champion promoted Cole to President of Retail, a promotion memorialized in a letter agreement (the "September

_____

[1] Cole also appeals the district court's denial of his motion to compel evidence. After reviewing the record, we find that the district court did not abuse its discretion. See Wells v. Liddy, 186 F.3d 505, 518 n.12 (4th Cir. 1999)(denying motion to compel).

[2] Because this is an appeal from the district court's grant of summary judgment to Champion, we review the facts in the light most favorable to Cole. Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008).

1998 Agreement"). The September 1998 Agreement conveyed the basic terms of Cole's employment and explicitly incorporated all terms from the January 1998 Agreement.

In the late 1990s, the mobile home industry experienced an economic downturn, and over a six-year period Champion's stock price dropped from $30 to $2 per share. In 2000, Champion asked Cole to surrender stock options that had severely plummeted in value. Champion then re-issued stock to Cole via two Stock Option Agreements ("SOAs") adopted in January and September 2001. The two SOAs contained identical covenants not to compete, providing in part that for two years following termination Cole could not:

> directly or indirectly . . . as owner, partner, joint venturer, employee, broker, agent, principal, trustee, corporate officer, licensor, consultant, or in any capacity whatsoever, engage in, become financially interested in, or have any connection with, any business located in the United States or Canada engaged in the production, sales, financing, insuring, or marketing of manufactured homes or the development of manufactured housing parks.

J.A. 125.

In 2002, Champion implemented provisions clarifying that its Board of Directors ("the Board") was in charge of all

4

aspects of executive compensation.[3]   Any agreements regarding executive compensation required the Board's approval.

In 2003, Cole's five-year employment contract expired,[4] and Champion's economic decline caused him to question his future with the company.   At Cole's request, he met with Champion's then-CEO Walt Young in Las Vegas to ensure that the expiration of his employment contract would not affect his severance or equity compensation if Champion terminated him.   Young told Cole that he could keep the severance provisions from the expired January 1998 Agreement and that similar agreements had been worked out with other executive officers.   However, Young reminded Cole that the Board ultimately had to approve all compensation related decisions.

A few months later, the Board terminated Young and installed Albert Koch as interim CEO.   Cole informed Koch of his previous communications with Young, and Koch reiterated that the Board (not the CEO) had ultimate decision-making authority regarding executive compensation.   In March 2004, Cole traveled to Detroit and met with Koch.   The parties discussed Cole's

---

[3] This clarification was at least partially in response to the Sarbanes-Oxley Act of 2002.   As Champion's President of Retail, Cole qualified as an "executive officer" (also known as a "Rule 16(b)" officer).

[4] Even after Cole's employment contract expired, he remained bound by the covenants not to compete located in the SOAs.

concerns regarding Champion's recently disseminated 2004 compensation plan for executive officers. Cole felt that the new plan's incentive compensation structure was inconsistent with his previous conversation with Young and failed to address his concerns about potential termination. Cole informed Koch that he was unwilling to continue working for Champion as long as these issues remained unsettled and that he would resign in five days if they could not reach an agreement. Koch asked for time, explaining that he would need to meet with Champion's pay consultants and get Board approval before any action could be taken.

Later that day, Koch and John Collins, Champion's General Counsel, called Cole on his cell phone. Koch acknowledged that Cole's primary concern was protecting the equity components of his compensation but said that Champion did not want to amend its equity compensation plans to provide Cole with immediate vesting upon termination without cause. Instead, Koch proposed a resolution whereby in the event of termination, Champion would continue to employ Cole in a de minimis capacity so that Cole's equity could vest. Cole indicated that the arrangement sounded workable, and Koch agreed to take it to the Board for approval. Cole contends that an agreement was reached during this phone call ("the March 2004 Agreement").

At an April 2004 Board meeting, Koch outlined his discussions with Cole. Koch then presented the following "Approval Request" to the Board in the form of PowerPoint slides:[5]

**Approval Request to Board**
- Increase Mark Cole salary by $20,000.
- Salary will increase to $300,000 after two profitable quarters (versus $285,000 now).
- Give Mark an option to:
  - Retain current restricted stock (40,000 shares) and target bonus of 80%, or
  - Take restricted stock of 50,000 shares and reduce target bonus to 60%.
- Give Mark a change of control agreement[.]

Ed Graskamp concurs with these changes.

If Mark Cole is removed as President of Retail without cause, then:
- He may continue as a CHC retailer with an approx. 80% stocking requirement,
- He will remain an employee with a different assignment requiring about 10 days per year.
- His salary will be reduced to approx. $20,000 to $30,000 per year.

This will preserve Mark's existing restricted stock and option grants. Vesting would occur on targeted dates if he is still employed.

J.A. 4681-82.

The PowerPoint slides did not address several issues, such as Cole's post-termination position and salary, any potential

---

[5] Microsoft PowerPoint is a software program typically used to create business presentations. The presentations consist of a progression of individual slides.

severance package, and how or when Cole would exercise his "option" to choose a reduction in his cash bonus in return for an increase in his number of performance shares. Nevertheless, the Board and the Compensation Committee approved Koch's request and authorized him to proceed with Cole. Koch informed Cole that the Board had approved the terms and that Collins would subsequently draft a contract for Cole's review.

Cole continued working for Champion in reliance on Koch's representations. In June 2004, Champion's legal department sent a draft of the agreement to Cole's lawyer, Alex Barrett. The draft included terms stating that "all previous employment agreements between [the parties] are hereby rescinded" and that the document "constitutes the sole and entire agreement." J.A. 4836. Barrett returned a blacklined modification to Champion, which Barrett described as "revisions from the first draft." J.A. 4692. This modified draft contained several provisions either inconsistent with or not addressed by the PowerPoint slides from the Board meeting. For example, the original provisions requiring Cole to stock 80% of Champion's products at his future retail locations and reducing Cole's annual incentive targets were deleted from this modified draft.

William Griffiths replaced Koch as Champion's CEO in August 2004. On or about September 1, 2004, Griffiths announced that Champion was getting out of the retail business. As Champion

8

continued to review Cole's modified draft of the employment agreement, Griffiths sought and received approval from the Board to terminate Cole's employment. Champion then demanded that Cole purchase its Eastern Retail Division in order for contract negotiations to continue, and in late September Cole submitted an offer to purchase those assets. The new proposal contained terms, including a retroactive salary increase and release of Cole's covenants not to compete, that did not appear in the PowerPoint outline.

On or about October 18, 2004, Champion terminated Cole without cause.[6] Champion offered Cole a one-year severance requiring him to release all claims against Champion, which Cole did not sign. Instead, Cole sent Champion a letter attempting to accept a de minimis employment role pursuant to the alleged March 2004 Agreement. Champion denied that an agreement had ever been reached.

Shortly thereafter, Champion began negotiations to sell its Eastern Retail Division to Phoenix Housing Group, Inc., of which Cole was the principal shareholder. Champion agreed to waive Cole's non-compete agreement to allow him to invest in the new company, but prevented him from becoming an officer or director.

---

[6] Upon Cole's termination, the two-year non-competition provisions located in his Stock Option Agreements began to run.

9

By mid-2005, although Champion had sold all of its traditional retail operations, it continued to hold Cole to the terms of his covenants not to compete. Cole abided by the covenants and now contends that he forewent several promising opportunities and investments in the manufactured housing industry as a result.

In April 2005, Cole filed suit against Champion and SSH in North Carolina state court, bringing claims for breach and repudiation of contract, failure to pay agreed-upon compensation, failure to pay wages under the North Carolina Wage and Hour Act,[7] unfair and deceptive trade practices, and illegal restraint of trade, and seeking a declaratory judgment to declare the covenants not to compete unenforceable. Champion removed the action to the district court, claiming that Cole's claims were partially preempted by ERISA and that Cole had fraudulently joined SSH to prevent removal. Champion filed a motion to dismiss. The district court subsequently ruled on the motion, converting the portions of Cole's claims relating to oral promises to pay severance benefits into ERISA claims and dismissing Cole's illegal restraint of trade and unfair and deceptive trade practices claims. Upon the parties' cross motions for summary judgment, the district court granted summary

---

[7] N.C. GEN. STAT. §§ 95-25.1 et seq.

judgment to Champion on all remaining claims.  Cole subsequently filed this appeal.

                                    II

On appeal, "we review de novo the district court's award of summary judgment, viewing the facts and the reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."  Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

We also review de novo a district court's dismissal pursuant to Fed. R. Civ. P. 12(b)(6).  Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir. 1991).  Upon review, "we must assume the truth of the material facts as alleged in the complaint." Jackson v. Birmingham Board of Educ., 544 U.S. 167, 171 (2005).

III

A.

We first consider whether the district court properly granted summary judgment on Cole's contract claims.[8] Under Michigan law, to prevail on a claim for breach of contract, a plaintiff must establish both the elements of a contract and the breach of it. Pawlak v. Redox Corp., 453 N.W.2d 304, 307 (Mich. App. 1990). A valid contract requires mutual assent with respect to all essential terms, Eerdmans v. Maki, 573 N.W.2d 329, 332 (Mich. App. 1997), and a meeting of the minds regarding all material facts. Kamalnath v. Mercy Mem. Hosp. Corp., 487 N.W.2d 499, 503 (Mich. App. 1992). "'[A] meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective

---

[8] Because this action was filed in North Carolina, we look to that state's conflict of laws analysis to identify the law governing Cole's contract claim. Under North Carolina law, the principle of lex loci contractus applies to choice-of-law decisions in contract cases; therefore, we apply the law of the state where the last act essential to a meeting of the minds occurs. Walden v. Vaughn, 579 S.E.2d 475, 477 (N.C. App. 2003). Although Cole contends that North Carolina law should control, we agree with the district court that Michigan law applies because the Board's approval, which would have been given in Michigan, was the last act necessary to form a binding contract. However, as noted by the district court, there is no relevant difference between North Carolina and Michigan contract law, and the outcome would be the same in either jurisdiction.

12

states of mind.'" Kloian v. Domino's Pizza LLC, 733 N.W.2d 766, 771 (Mich. App. 2006)(quoting Kamalnath, 487 N.W.2d at 503).

We find that there was never an enforceable contract between the parties on the terms Cole seeks to enforce. Initially, we conclude that no contract could have been created during Cole's April 2003 meeting with Young or his March 2004 meeting with Koch because both CEOs made it clear that, due to Cole's status as an executive officer, the Board's approval was required before any binding agreement could be adopted. The CEOs therefore had no authority to determine Cole's compensation, and a contract cannot be formed when "in the contemplation of both parties thereto, something remains to be done to establish contract relations." Central Bitulithic Paving Co. v. Village of Highland Park, 129 N.W. 46, 48 (Mich. 1910). Because Cole understood that any agreement could not be final without Board approval, he cannot credibly contend that Koch or Young had authority to enter into a valid compensation agreement.[9]

Furthermore, a contract was not formed in April 2004 when the Board approved the proposal presented by Koch. The

---

[9] This also defeats Cole's claim that an oral severance agreement was created during a March 2004 conversation between Koch and Cole. Assuming that Koch did make such a promise, both parties knew that he did not have authority to enter into a binding compensation agreement without the Board's approval. Cole challenges the district court's conversion and eventual dismissal of these severance claims, but we find no error.

13

PowerPoint slides approved by the Board did not contain all material terms of the potential agreement. For example, the slides were silent regarding crucial issues such as the specific position that Cole would fill upon termination, the severance package to be received by Cole, or whether Cole's de minimis employment would be guaranteed until his equity compensation vested. Even some of the terms that do appear in the PowerPoint slides are indefinite; for example, there is merely a vague reference to Cole's post-termination salary, specifying only that it will be "approx[imately] $20,000 to $30,000 per year." Because the PowerPoint slides were indefinite and uncertain, the Board's approval of it could not have created a contract.

Moreover, the actions of the parties following the April Board meeting confirm that there was never a meeting of the minds between Cole and Champion. Champion drafted a proposed contract and sent it to Cole for his approval; instead of accepting the offer (or suggesting that a binding agreement had already been reached), Cole's attorney sent a revised proposal to Champion's lawyers. Importantly, this revised draft contained several changes that had not been discussed by the parties; for example, the 80% stocking requirement if Cole became a CHC retailer was struck, and the modified draft gave Cole the 50,000 performance shares while allowing him to keep the 80% target bonus.

14

Over the next few months, the parties continued to negotiate over the eventual final terms of the contract. These negotiations prevented Cole or Champion from reasonably believing that they were already obligated by an enforceable agreement, whether embodied in the PowerPoint slides or created orally by Cole and Koch. As a result, Cole cannot recover for breach of contract.

## B.

Cole also cannot recover under the North Carolina Wage and Hour Act. N.C. GEN. STAT. §§ 95-25.1 et seq. The Act provides a private right of action to employees for recovery of unpaid wages owed by their employers, and defines "wage" to include severance pay and other amounts "promised when the employer has a policy or a practice of making such payments." N.C.GEN.STAT. § 95-25.2(16). As explained above, Champion and Cole never had an enforceable agreement, and the company therefore does not owe wages.

## C.

Cole also contends that the covenants not to compete found in his two SOAs are invalid and unenforceable because their terms are unreasonable restraints on trade. He seeks to recover damages he allegedly incurred while adhering to the covenants'

15

two-year restriction.[10]  Under Michigan law, a covenant not to compete is enforceable if it "protects an employer's reasonable competitive business interests and . . . is reasonable as to its duration, geographical area, and the type of employment or line of business."  MICH. COMP. LAWS §445.774a(1).  To be reasonable, an employer's business interest must be "greater than merely preventing competition . . . [it] must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill."  <u>Coates v. Bastian Brothers, Inc.</u>, 741 N.W.2d 539, 545 (Mich. App. 2007)(citation omitted).  "The reasonableness of a covenant not to compete is not analyzed in the abstract, but in the context of the employer's particular business interest and the function and knowledge of the particular employee."  <u>Whirlpool Corp. v. Burns</u>, 457 F.Supp.2d 806, 812 (W.D. Mich. 2006).  Put another way, it is not reasonable to put equally strict restrictions on "an entry level

---

[10] Because Cole seeks damages for illegal restraint of trade under N.C. GEN. STAT. § 75-1, the reasonableness of the covenants is not moot even though the terms of the covenant have expired. Although Cole pursues damages under a North Carolina statute, the covenants not to compete were located in the SOAs; thus, <u>lex loci contractus</u> governs which law applies to the reasonableness of the covenants.  The record is unclear as to whether Cole signed the SOAs in Michigan or North Carolina.  Although we analyze under Michigan law, we note that the outcome is the same under either state's law.

16

computer programmer as might be placed upon a system designer." Kelsey-Hayes Co. v. Maleki, 765 F.Supp. 402, 406 (E.D. Mich.), vacated pursuant to settlement, 889 F.Supp. 1583 (E.D. Mich. 1991).

We find that Champion had a legitimate business interest to protect. Although the company ceased to own any traditional retail lots in September 2004, it was not automatically stripped of any legitimate interest in the manufactured housing market as a whole. Cole, as an executive officer, had confidential and proprietary knowledge about all aspects of Champion's business, and that information went beyond general knowledge or skill. Even after Champion sold its traditional retail operations, a significant portion of its business continued to involve selling manufactured housing wholesale to retail lots, builders, and developers. Champion thus had an interest in keeping Cole out of the market for a reasonable amount of time, as his entrance into the market could have threatened the distribution channels which were such a large part of Champion's core business. The covenants not to compete are therefore valid and enforceable so long as their terms were reasonable.

In light of Cole's role as an executive officer possessing confidential information, we find that a two-year restriction is reasonable. See Bristol Window & Door, Inc. v. Hoogenstyn, 650 N.W.2d 670 (Mich. App. 2002)(enforcing a three-year non-

17

competition covenant). In addition, Michigan courts have held that an unlimited geographical scope may be reasonable if the business's scope is sufficiently national or international. <u>See</u> <u>Lowry Computer Products, Inc. v. Head</u>, 984 F.Supp. 1111, 1116 (E.D. Mich. 1997). Champion is a publicly held company producing and providing manufactured housing throughout North America; accordingly, we find its business to be geographically broad enough to justify a restriction covering the United States and Canada.[11]

IV

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

---

[11] Because the terms of the covenants are reasonable, we do not reach further "illegal restraint of trade" analysis under N.C. GEN. STAT. § 75-1. Therefore, Cole's illegal restraint of trade claim fails. Cole's "unfair and deceptive trade practices" claim under § 75-1.1(a) also fails. As noted by the district court, the fact that Champion proposed terms that were unacceptable to Cole is not the type of activity envisioned by the statute. <u>See</u> <u>e.g.</u> <u>Branch Banking and Trust Co. v. Thompson</u>, 418 S.E.2d 694, 700 (N.C. App. 1992)(holding that a trade practice is unfair if it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious").

18