**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3275
_____

JOHN J. HALL; JEANETTE A. HALL, as administrators and
personal representatives of the Estate of Karlie A. Hall,
and in their own right as decedent's heirs-at-law,
Appellants

v.

MILLERSVILLE UNIVERSITY; SARA WIBERG,
individually and as an employee of Millersville University;
ACACIA NATIONAL FRATERNITY; ACACIA
FRATERNITY CHAPTER NUMBER 84; COLIN
HERBINE, individually and as an agent of Acacia Fraternity
Chapter No. 84; JACK MILITO, individually and as an agent
of Acacia Fraternity Chapter No. 84; NICHOLAS HENCH,
individually and as an agent of Acacia Fraternity Chapter No.
84; SEAN EBERT, individually and as an agent of
Acacia Fraternity Chapter No. 84; NIGALE QUILES,
individually and as an agent of Acacia Fraternity Chapter No.
84; JOHN DOES #1-5, individually and as an agents of
Acacia Fraternity Chapter No. 84
_____

On Appeal from the United States District Court

for the Eastern District of Pennsylvania

(District Court Civil No. 5-17-cv-00220)
District Judge: Honorable Edward G. Smith

Argued October 14, 2021

BEFORE: SHWARTZ, NYGAARD, and FISHER,
*Circuit Judges*


(Filed: January 11, 2022)

Brian D. Kent
M. Stewart Ryan
Laffey Bucci & Kent
1100 Ludlow Street, Suite 301
Philadelphia, PA 19107

*Counsel for Appellants*

James P. Davy [Argued]
P.O. Box 15216
Philadelphia, PA 19125

*Counsel for Appellant Jeanette A. Hall*

Josh Shapiro, Attorney General
Claudia M. Tesoro [Argued]
Office of Attorney General of Pennsylvania
1600 Arch Street, Suite 300
Philadelphia, PA 19103

Kevin R. Bradford
Stephen R. Kovatis
Office of Attorney General of Pennsylvania
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107

     *Counsel for Appellees*

Margaret H. Zhang
Women's Law Project
125 South 9th Street, Suite 300
Philadelphia, PA 19107

     *Counsel for Amicus Appellants*

—————

OPINION OF THE COURT
—————

NYGAARD, *Circuit Judge.*

     John and Jeanette Hall ("the Halls") sued Millersville University ("Millersville") under Title IX after their daughter, Karlie Hall, was murdered in her dorm room by her boyfriend, Gregorio Orrostieta. Despite finding genuine issues of material fact for each element of the Halls' Title IX claim, the District Court granted summary judgment in Millersville's favor, holding that Millersville lacked notice it could face liability

3

under Title IX for the actions of a non-student guest. The Halls appeal, and this Court must now consider whether Millersville had adequate notice it could be liable under Title IX for its deliberate indifference to known sexual harassment perpetrated by a non-student guest. We hold Millersville had such notice.

Title IX's plain terms notify federal funding recipients that they may face monetary liability for intentional violations of the statute. Moreover, it is an intentional violation of Title IX's terms for a funding recipient to act with deliberate indifference to known sexual harassment where the recipient exercises substantial control over the context in which the harassment occurs and the harasser, even if they are a third party. Given this framework, we conclude the text of Title IX provides Millersville and other federal funding recipients with adequate notice. We must therefore reverse and remand. Nevertheless, because we agree with the District Court that genuine issues of material fact exist for each element of the Halls' Title IX claim, we will affirm the District Court's order to the extent it holds these factual disputes preclude summary judgment in Millersville's favor.

## I. BACKGROUND

Because this case is fact-laden, we must encumber the reader with much detail.

### A. Origins of Karlie's Relationship with Orrostieta

Karlie Hall began dating Orrostieta around March of 2014, while Karlie was a senior in high school. The two continued dating through the summer of 2014, and by

4

summer's end Orrostieta was visiting Karlie daily and would often spend the night with Karlie in her room. At that time, Karlie lived with her mother, Jeanette, and her twin sister, Kristen, at Jeanette Halls' home.

During this period, and while at Jeanette's home, Orrostieta exhibited abusive behavior towards Karlie. On one occasion, Kristen overheard Karlie yell "you hit me" back at Orrostieta after he had screamed at Karlie while she showered. Joint Appendix at 11, 151, 158. Additionally, during a party thrown at Jeanette's home, Kristen heard banging coming from a room Karlie and Orrostieta were locked in, though the two eventually came out as if nothing had happened.

In August of 2014, Karlie and Kristen enrolled in Millersville and moved from their mother's home into their respective dormitories, with Karlie living in Bard Hall and Kristen in Gaige Hall. While at Millersville, Karlie maintained her relationship with Orrostieta and often invited him into Bard Hall as her guest. On occasion, Karlie would bring Orrostieta into Bard Hall through a rear entrance that she and her roommate, Tina Flexer, both found convenient.

## B. October 4th-5th Incident of Dating Violence

As Karlie's first semester at Millersville continued, so too did Orrostieta's visits, and his abuse.[1] On October 4th,

---

[1] Orrostieta exhibited abusive behavior towards Karlie, as well as Karlie's friends, prior to the October 4th incident in Karlie's dorm room. In September of 2014, Orrostieta destroyed one of Karlie's stuffed animals in an argument. Also on October 4th, after losing track of Karlie at a party, Orrostieta grabbed Tina

2014, the day after Karlie and Kristin's 18th birthday, Orrostieta visited and stayed with Karlie in the room she shared with Tina Flexer. That night, Karlie and Orrostieta went to a party with Flexer, though Flexer left early and went back to Bard Hall. When Karlie and Orrostieta returned in the early hours of October 5th, Flexer noticed that Karlie had been crying. Later that night, Flexer approached Karlie in the hallway outside their dorm room and Karlie explained she had been crying because she had been in a verbal fight with Orrostieta. Sara Wiberg, the resident assistant for Karlie's floor, also noticed Karlie's crying and questioned Flexer about Karlie in the hallway. As Wiberg spoke with Flexer, the two heard rustling sounds coming from inside Karlie's room and eventually heard Karlie scream "ow." Joint Appendix at 12, 152, 160, 165. Wiberg then knocked on Karlie's door, which Orrostieta answered.

When Orrostieta opened the door, Karlie was in bed with her back to Wiberg. Wiberg then spoke with Orrostieta about Karlie's yell and the rustling noises. Although Orrostieta was not direct in his responses, he admitted things between him and Karlie "got a little physical" when he attempted to force himself into her bed. Joint Appendix at 12-13, 153, 160, 166. Orrostieta then exited Karlie's room and waited in the hallway while Wiberg went in to check on Karlie. Once in the room, Wiberg saw Karlie had been crying and that her face was red and puffy. Karlie informed Wiberg that she wanted Orrostieta to leave but did not say much else. Wiberg then left Karlie's room.

---

Flexer by her shoulders, threatened her, and forcefully shook her while demanding to know Karlie's location.

Once outside, Orrostieta begged Wiberg to stay on campus. At that time, Millersville had a policy that if a student no longer wants their guest on campus, the guest must leave. Wiberg thus had Orrostieta gather his things from Karlie's room and go with her to another resident assistant's room, where Wiberg and the other resident assistant reiterated Millersville's guest policy to Orrostieta and ultimately decided to call Millersville University Police to assist in his removal.

After receiving a call about a subject refusing to leave campus, Millersville police officer Brian Liddick arrived at Bard Hall. Once there, Liddick spoke with Orrostieta, who Wiberg recalls was "very persistent on not leaving" and "still very upset." Joint Appendix at 13, 153, 161, 166. Orrostieta explained to Liddick that he had not touched or hit Karlie, and that he did not have a ride home. Liddick then contacted Orrostieta's friend to arrange for a pickup and drove Orrostieta to a nearby gas station. Despite taking notes on his interactions with Wiberg and Orrostieta, Liddick did not create an incident report immediately after dropping off Orrostieta. Liddick's incident report for this event was made on February 11, 2015, at the direction of a supervisor in the wake of Karlie's murder.

Following Orrostieta's removal from campus, Wiberg repeatedly returned to Karlie's room to check on Karlie. At one point in the evening, Flexer recalls Wiberg observing Karlie's injury and getting an ice pack for Karlie's face. After she finished checking on Karlie, Wiberg drafted an incident report pursuant to her duties as a resident assistant and to fulfil her obligations under Millersville's Title IX policy, which required that a report be made after observing an incident of domestic or dating violence. Wiberg's report included a general description of the events that transpired between Karlie and

7

Orrostieta between the evening of October 4th and early morning hours of October 5th. Wiberg's incident report was received by Ron Wiafe, Millersville's Assistant Director of Judicial Affairs and Deputy Title IX Coordinator, as well as Alison Sehl, the Area Coordinator at Millersville. Wiafe looked over Wiberg's report and then filed it away. Sehl did not forward Wiberg's report and did not discuss it with anyone until after Karlie's murder.

After Wiberg left, Flexer returned to the dorm room and spoke with Karlie alone. Karlie initially kept her back to Flexer, but Flexer eventually noticed that "there was something weird with her eye" because it "was really red." Joint Appendix at 13-14, 154, 161. When Flexer asked her what happened, Karlie stated Orrostieta had pressed the heel of his hand on Karlie's eye and had pushed her down into a pillow. Flexer doubted this story and believed that Orrostieta had hit Karlie, rather than merely pushed her. For that reason, the next day Flexer called her mother, Renea Flexer, and described Karlie's injury and what she had observed between Karlie and Orrostieta. Renea then called Millersville University Police, Millersville counseling department, and Alison Sehl to report Karlie's domestic assault and black eye. Each time Renea called she was told that nothing could be done without a complaining witness.

Karlie tried to hide her injury from others in the week following the October 4th incident. During that week, Karlie avoided her sister Kristen, she rarely left her room, and she missed class.

C. *Karlie and Orrostieta's Relationship post October 4th and Karlie's Murder*

In the aftermath of the October 4th incident, Karlie and Orrostieta's relationship was "on again, off again." Joint Appendix at 155, 162. They were still dating as of Thanksgiving 2014, and Orrostieta lived with Karlie at Jeanette Hall's house while Karlie was there during her winter break. At some point during this winter break, Karlie and Orrostieta returned to her dorm room in Bard Hall and were discovered by Wiberg. Although Karlie was allowed to be at Bard Hall, Millersville policy did not allow dorm room guests over winter break, and so Wiberg had Orrostieta removed.

At the end of the break, Karlie returned to Millersville to begin her second semester. Shortly thereafter, on February 7th, 2015, Karlie attended an Acacia fraternity party with Orrostieta and a group of friends. Karlie and Orrostieta fought during the party, though they later returned to her room in Bard Hall together. After Karlie and Orrostieta returned, other residents of Bard Hall heard the sounds of furniture moving in Karlie's room, as well as the sound of a female voice screaming for help. In response to these sounds, Wiberg knocked on Karlie's door but heard nothing and did not further pursue the matter. That night Orrostieta killed Karlie through "strangulation and multiple traumatic injuries," and potentially sexually assaulted her. Joint Appendix at 16, 157, 163-64. After police investigation, Orrostieta was arrested and later convicted of third-degree murder.

### D. Relevant Millersville Policies

Throughout Karlie's enrollment, Millersville maintained a Title IX Policy. This policy covered all areas of Millersville operations, programs, and sites, and included the conduct of employees, students, visitors/third parties, and

applicants. This policy defined sexual misconduct to include dating and domestic violence, and any conduct constituting sexual misconduct under this policy was considered a violation of Title IX.

Pursuant to Millersville's Title IX Policy, any Deputy Title IX Coordinator or Area Coordinator was required to report any instance of sexual misconduct to the Title IX Coordinator or other designated employee and ensure that the report was actually received. Under this policy, Wiafe and Sehl, as Deputy Title IX Coordinator and Area Coordinator, respectively, were thus required to forward Wiberg's report to Millersville's Title IX Coordinator and ensure its receipt. Neither did so. Millersville's Title IX Policy also required that victims of domestic or dating violence on campus be contacted by someone at Millersville. Karlie was not contacted by someone at Millersville after Wiberg's report of the October 4th incident.

Outside of its Title IX Policy, Millersville also maintained policies for controlling who was allowed on its campus. For example, Millersville had a guest policy that required overnight guests, such as Orrostieta, to check in with a student employee at the entrance of any dormitory, sign a logbook, and leave a form of identification during their stay. The same guest policy also stated that no individual guest was permitted to stay in a dormitory for more than three consecutive days, or eight total days in one month. Millersville also controlled who entered its residence halls by limiting access to those with a student identification card and by requiring that visitors and students not assigned to a designated residence hall be escorted by a valid resident. Additionally, Millersville had the ability to issue "No Trespass Orders,"

10

which would ban individuals from being on Millersville's campus.

## II.    JURISDICTION & STANDARD OF REVIEW

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291.

Our review of the District Court's grant of summary judgment is plenary. *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016). Moreover, our review of the District Court's legal rulings is *de novo*. *Shelton v. Bledsoe*, 775 F.3d 554, 559 (3d Cir. 2015). In reviewing the summary judgment record, we apply the same standard as the District Court. *Id.* To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). Because the Halls were the nonmoving party, we must review the record in the light most favorable to them and draw all reasonable inferences in their favor. *Shelton*, 775 F.3d at 559.

## III.    DISCUSSION

### A. *Notice of Liability*

The first issue we must address is whether, as a matter of law, Millersville could not be held liable under Title IX because it lacked notice that its deliberate indifference to sexual harassment perpetrated by a non-student guest could result in Title IX liability.

11

The District Court determined Millersville lacked the requisite notice because neither this Court nor the Supreme Court had extended Title IX liability to situations in which a federal funding recipient was deliberately indifferent to sexual harassment committed by a student's non-student guest. In reaching this holding, the District Court reviewed Title IX's regulatory scheme, state common law, and Title IX guidance materials published by the Office for Civil Rights. The District Court found that, at most, these materials "put educational institutions on notice that they face potential liability for the misconduct of their students or other parties whom they play a critical role in connecting with the student, *e.g.*, a work-study program, a student loan agency, or a school-invited athlete or speaker." Joint Appendix at 57. As Orrostieta was a non-student guest invited by Karlie and not by Millersville, however, the District Court concluded these materials did not provide Millersville with sufficient notice to support a cause of action under Title IX.

On appeal, Millersville maintains the District Court correctly decided this issue because no court has extended Title IX liability to instances of sexual harassment committed by a student's non-student guest, and neither Title IX nor any administrative guidance materials contemplate Title IX liability for the same. The Halls, on the other hand, contend the District Court's holding was error. They argue the Supreme Court has already established that federal funding recipients such as Millersville could face Title IX liability for their deliberate indifference to harassment committed by third parties, so long as the recipient has control over the harasser and context of harassment. The Halls thus maintain the District Court erred by categorically rejecting liability because of Orrostieta's status as a non-student guest, rather than analyzing

12

Millersville's control over both Orrostieta and the context of Karlie's harassment. After a careful review of the record, precedent, and the parties' briefing, we agree with the Halls.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To enforce this prohibition on intentional sex-based discrimination, the Supreme Court has recognized that Title IX implies a private right of action and that monetary damages are available in such suits. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005); *see Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992). Because Title IX is legislation enacted pursuant to Congress's authority under the spending clause, however, "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Davis ex rel. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). "When Congress enacts legislation under its spending power, that legislation is 'in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Jackson*, 544 U.S. at 181-82 (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Where the State is unaware of the conditions or unable to ascertain what is expected of it, there can be no knowing acceptance. *Pennhurst*, 451 U.S. at 17. Accordingly, if the federal funding recipient lacks notice it could be held liable for certain conduct, an implied right of action under Title IX will not lie under *Pennhurst*.

*Pennhurst's* notice requirement "does not bar a private damages action under Title IX where the funding recipient

13

engages in intentional conduct that violates the clear terms of the statute." *Davis*, 526 U.S. at 642. This is because Title IX's plain language unquestionably places a duty on funding recipients to not discriminate based on sex, and as such, the text of Title IX gives recipients notice that intentional discrimination will result in liability under the statute. *Franklin*, 503 U.S. at 74-75; *see also Jackson*, 544 U.S. at 182. It is for this reason that the Supreme Court has, throughout its Title IX jurisprudence, rejected arguments that *Pennhurst* bars a particular plaintiff's cause of action after finding that a funding recipient's conduct constituted an intentional violation of Title IX.

Take *Gebser*, for example, where the Supreme Court dealt with whether an implied right of action for monetary damages under Title IX could lie for a teacher's sexual harassment of a student. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998). There, the appellant argued that federal funding recipients could be subject to monetary liability under Title IX for their employees' sexual harassment under theories of *respondeat superior* and constructive notice. *Id.* at 282-83. The Supreme Court rejected these arguments under *Pennhurst*, however, noting that "[i]f a school district's liability for a teacher's sexual harassment rests on principles of constructive notice or *respondeat superior*, it will likewise be the case that the recipient of funds was unaware of the discrimination." *Id.* at 287. Without awareness or actual knowledge of discrimination, the funding recipient could not have intentionally violated the clear terms of Title IX, and thus the terms of Title IX could not have provided adequate notice. *Id.* at 288. That said, the Supreme Court determined that a private right of action for monetary damages under Title IX based on a teacher's sexual harassment could lie, albeit in

14

limited circumstances where the funding recipient was aware of the discrimination, had authority to address it, but remained deliberately indifferent. *Id.* at 290-91. When these circumstances were present, the Court found, a funding recipient intentionally acted in violation of Title IX's terms. *Id.*; *see also Davis*, 526 U.S. at 642-43 (explaining the Supreme Court's holding in *Gebser*).

Next, in *Davis*, the Supreme Court held that *Pennhurst* did not bar a plaintiff's cause of action for a funding recipient's deliberate indifference to student-on-student sexual harassment. *Davis*, 526 U.S. at 639-44. On appeal, the funding recipient argued that *Pennhurst* barred such a cause of action because Title IX provided no notice that funding recipients could face monetary liability for harm arising from student-on-student harassment. *Id.* at 640. The Supreme Court disagreed. *Id.* at 640-649. Tracing its Title IX jurisprudence, the Supreme Court reiterated that *Pennhurst* did not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute. *Id.* at 642 (citing *Franklin*, 503 U.S. at 74-75). Thus, to determine whether the *Pennhurst* notice requirement applied in *Davis*, the Supreme Court had to ascertain whether the funding recipient's conduct—deliberate indifference to known student-on-student harassment—constituted an intentional violation of Title IX. *Id.* at 643. The Supreme Court found that it did, but only in limited circumstances where the recipient had control over the harasser and the context of harassment. *Id.* at 645. This control was necessary because without it a funding recipient's deliberate indifference could not "subject" its students to harassment in violation of Title IX's plain terms. *Id.* at 643-46. Ultimately, then, because the Supreme Court determined that the funding recipient's alleged deliberate indifference

15

constituted an intentional violation of Title IX's terms, the Court determined that *Pennhurst* did not apply and that the recipient had adequate notice of liability. *Id.*

Lastly, in *Jackson* the Supreme Court held that *Pennhurst* did not bar a plaintiff's Title IX claim for retaliation because the defendant's conduct constituted an intentional violation of Title IX's terms. *Jackson*, 544 U.S. at 183. Much like the funding recipient in *Davis*, the recipient in *Jackson* argued that *Pennhurst* precluded liability for a retaliation claim since the recipient lacked notice it could be held liable for retaliating against those who complain of Title IX violations. *Id.* at 182. And much like in *Davis*, the Supreme Court disagreed. *Id.* Because retaliation is "intentional conduct that violates the clear terms of the statute," *Pennhurst* did not apply as "Title IX itself therefore supplied sufficient notice." *Id.* at 183.

Against this backdrop, and for the reasons we set forth herein, we conclude that the District Court erred in holding that Millersville lacked adequate notice of liability that it could be held monetarily liable under Title IX for its deliberate indifference to a nonstudent's conduct. The Supreme Court made clear in *Davis* that a funding recipient may be liable for acts of sexual harassment by individuals other than students. 526 U.S. at 643-46. Though *Davis* concerned only deliberate indifference to known student-on-student harassment, the Court's holding was not based upon the classification of the harasser as a student, guest, or other type of third party. *See also Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007) (nonstudent football recruits). Instead, the Court's focus was on whether the funding recipient had control over the harasser and the context of the harassment since the

16

funding recipient can only "subject" students to discrimination under Title IX if it has control over the harasser and remains deliberately indifferent to the harasser's actions. *Davis*, 526 U.S. at 644-46.

The record shows that Millersville knew, and intended, for its Title IX policies to apply to nonstudents. Millersville's 2014 Title IX policy, which was in place while Karlie was enrolled, defined sexual misconduct to include sexual assault and intimate partner/dating violence, and also required that incidents of sexual misconduct be reported to Millersville's Title IX Coordinator. More importantly, as admitted by Millersville's corporate designee, this policy "cover[ed] all areas of University operations, programs, sites, and include[d] the conduct of employees, students, visitors/third parties, and applicants." District Court Docket No. 148-20, Deposition of Elizabeth Swantek, 37:5-39:16. Millersville also believed that sexual misconduct as defined in its 2014 Title IX policy violated Title IX. Millersville's own Title IX policy thus contemplated Title IX liability could result from the actions of third parties such as "visitors" like Orrostieta. Although we do not rely on Millersville's 2014 Title IX policy for our holding or as an indicium of congressional notice, "we do find support for our reading of Title IX in the fact that [Millersville itself] rendered an analogous interpretation." *Davis*, 526 U.S. at 647.

We find additional support for our holding in the same Office for Civil Rights guidance materials considered by the District Court. Throughout, the Office for Civil Rights explains that sexual harassment by third parties could result in liability. *See e.g.*, Office for Civil Rights; Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034-01 (Mar. 13, 1997) ("The

17

Office for Civil Rights has long recognized that sexual harassment of students engaged in by school employees, other students, or third parties, is covered by Title IX."); *id.* at 12038 ("Sexually harassing conduct . . . by an employee, by another student, or by a third party. . . ."); *id.* at 12039 ("Title IX protects any 'person' from sex discrimination; accordingly both male and female students are protected from sexual harassment engaged in by a school's employees, other students, or third parties.").

Despite these clear references to liability resulting from third-party harassment, the District Court focused solely on the section that states "[s]exually harassing conduct of third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic club) can also cause a sexually hostile environment in school programs or activities." *Id.* at 12040. Given this language, the District Court concluded that, at most, funding recipients had notice they could face liability from harassment committed by parties that the university had invited, like a visiting athlete or professor. We believe this reading was error. Because the "visiting speaker or members of a visiting athletic club" language was preceded by an "e.g." it should be read as a list of illustrative examples, not an exhaustive list of all third parties whose harassment creates liability. Antonin Scalia & Bryan A. Garner, Reading Law (2012), at 132; *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 347 (3d Cir. 2007) ("Clearly this list of examples is not exclusive, hence the 'e.g.'"). The District Court's interpretation of this language is also belied by other sections of the guidance. In the section subtitled "Application of Guidance to Harassment by Third Parties" the Office for Civil Rights notes that "[s]everal commenters stated that it was

18

unclear whether the Guidance applies if a student alleges harassment by a third party, i.e., by someone who is not an employee at the school." Office for Civil Rights; Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. at 12036. The Office of Civil Rights addressed these comments, explaining:

> The Guidance clarifies that the principles in the Guidance apply to situations in which, for example, a student alleges that harassment by a visiting professional speaker or members of a visiting athletic team created a sexually hostile environment. . . . The applicable standards have not changed, but the final Guidance clarifies that the same standards also apply *if adults who are not employees or agents of the school engage in harassment of students*.

*Id*. (emphasis added). Although our holding does not depend on these guidance materials, taken together these materials should have given Millersville sufficient notice that third-party harassment fell within the scope of Title IX's proscriptions.

Further support for our holding today can be found in the Title IX decisions of other Circuit Courts of Appeals. While none of our sister circuits have addressed the issue raised on appeal here, they have consistently held that *Pennhurst* does not bar suit when a funding recipient intentionally violates Title IX's plain terms. *See e.g.*, *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 920-21 (7th Cir. 2012); *Doe v.*

19

*Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020) ("Title IX is contractual in nature, not banning discrimination outright but conditioning an offer of federal funding on a promise by the recipient not to discriminate. Put simply, there are strings attached. And if a school that receives federal funding violates the no sex discrimination condition, it may be held liable for money damages.") (quotations and footnotes omitted). As such, the Title IX decisions of our sister circuits have often analyzed the alleged conduct of funding recipients to determine whether their conduct constitutes an intentional violation of Title IX's terms. *See, e.g.*, *Doe v. Fairfax Cnty. Sch. Bd.*, 10 F.4th 406, 410-412 (4th Cir. 2021) (Wynn, J. concurring) (addressing dissent's argument that *Pennhurst* barred liability because Title IX did not provide notice of liability for pre-notice sexual harassment, and explaining that a funding recipient's failure to respond after learning of a single incident of sexual assault can "subject" a student to discrimination in violation of Title IX's plain terms, and thus the text of Title IX provided sufficient notice).

As a final note, we write to address Millersville's argument that our holding here will open the floodgates and subject universities to unwarranted liability under Title IX for "anyone's on-campus conduct resulting in the disruption or outright destruction of a student's pursuit of her education." Brief of Appellee at 36. While we recognize that this is a valid policy concern, the Supreme Court's holding in *Davis* forecloses Millersville's worry. To be liable under Title IX, the university would have to have "substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. Moreover, the university would have to know of the harassment and ultimately respond in a manner that is "clearly unreasonable." *Id*. at 648-49. We

20

do not think it is likely that a university would have substantial control over any random third party who wanders onto an open campus and harasses students, nor it is likely that a university would have substantial control over all aspects of a campus which is open to the public. *Id*. at 649 ("A university might not, for example, be expected to exercise the same degree of control over its students that a grade school would enjoy."). Even if the university had such control, however, if the university is not made aware of the third-party harassment or responds in a manner that is not clearly unreasonable, it will not face liability. Put simply, there is a high bar to establish liability for deliberate indifference under Title IX, and our holding today does little to lower that bar.

## B. *Summary Judgment Evidence*

Having found that Millersville had adequate notice of liability, we next turn our attention to the other issue raised on appeal: whether the trial court erred in finding that genuine issues of material fact existed for each element of the Halls' deliberate indifference claim. The Halls contend the District Court got this issue right, and that the summary judgment record fully supports the District Court's holding. Millersville disagrees and argues that the summary judgment record supports granting summary judgment in Millersville's favor, because Millersville lacked control over Orrostieta and Karlie's dorm room, and its actions did not constitute deliberate indifference. Moreover, Millersville asserts the District Court should not have even decided this issue and should have stopped its opinion as soon as it concluded that Millersville lacked notice of liability.

To prevail on their Title IX claim, the Halls must show:

21

1) Millersville received federal funds;
2) sexual harassment occurred;
3) Millersville exercised substantial control over the harasser and the context in which the harassment occurred;
4) Millersville had actual knowledge of the harassment;
5) Millersville was deliberately indifferent to the harassment; and
6) the harassment was so severe, pervasive, and objectively offensive that it deprived Karlie Hall of her access to the educational opportunities or benefits provided by the school.

*See Davis*, 526 U.S. at 645-650. Here, there is no question that Millersville receives federal funding and that Orrostieta's conduct constituted sexual harassment, and neither party claims otherwise. Brief of Appellee, 20 n. 16. Accordingly, to defeat Millersville's motion for summary judgment, the Halls needed to show there were genuine issues of material fact as to the remaining elements. We find that the Halls have done so.

i. Millersville's Control over Orrostieta and Bard Hall

To start, we find there is sufficient evidence in the record to raise a genuine issue of material fact as to whether Millersville exercised substantial control over Orrostieta and the context in which Karlie's harassment occurred. The record shows that Millersville maintained guest policies for its dormitories, which put rules in place for when guests like Orrostieta were allowed to stay overnight in Millersville's

22

dorms.[2] Moreover, the record reveals that Millersville relied on these policies to justify exercising some control over Orrostieta when removing him from Bard Hall on multiple occasions: once after Karlie stated she wanted Orrostieta to leave on October 5th, and again after he was caught on campus with Karlie during her winter break. The record further discloses that Millersville had the ability to issue "No Trespass Orders" to keep third parties off of its campus, though the efficacy of such orders is in dispute.

Nevertheless, Millersville argues that it is entitled to summary judgment on this element because Orrostieta's status as a non-student meant Millersville lacked jurisdiction over him, and thus he could not be subjected to formal disciplinary action. This argument misses the mark. Whether Millersville had control over Orrostieta is not a limited inquiry into

---

[2] We recognize the record shows that Orrostieta may have bypassed these policies on previous occasions, given that Karlie had allowed him to enter through a rear entrance. Nothing in the record shows that Orrostieta entered through that rear entrance on October 4th, or the night Karlie was murdered, however. Moreover, while this evidence may cut against the Hall's claim that Millersville maintained control over Orrostieta and the context of Karlie's harassment, it alone does not convince us that summary judgment for Millersville is proper. Our purview is to determine if there is a genuine dispute of material fact on an issue, not to weigh the evidence and act as a fact finder. *Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) As there is evidence suggesting Millersville had control, this issue is best left for the jury.

23

Millersville's *formal* disciplinary authority, but a broader examination of the degree of control Millersville had over him and its ability to "take remedial action." *Davis*, 526 U.S. at 644. Even assuming that formal disciplinary authority is required, however, we cannot find in Millersville's favor. Millersville relied on its own policies to remove Orrostieta on two separate occasions, and it had the authority to issue a "No Trespass Order," which Millersville admits "can be issued against anyone, and is meant to prevent the individual in question from accessing a specified location or the entire campus." Brief of Appellee at 45. Given these facts, we conclude there is at least a genuine issue of material fact as to Millersville's control over Orrostieta.[3]

Millersville also asserts that it is entitled to summary judgment on this element because it lacked control over the context of Karlie's harassment, since it occurred in her private dorm room. As to this argument, we agree with the District Court. This case does not concern Karlie's privacy; it concerns the control Millersville had over the context of Karlie's harassment. Here, the record is replete with evidence sufficient

---

[3] In its briefing, Millersville recognizes that Title IX liability may arise in situations involving visiting speakers, visiting athletes, and other third parties who are "official guests of the school or college, or otherwise on the premises for a school-related purpose." Brief of Appellee at 31. This admission further cuts against Millersville's argument that it lacked control over Orrostieta due to a lack of formal disciplinary authority. We fail to see how a school's formal disciplinary authority could extend to these parties, who are neither employees nor students of the school, but at the same time fail to extend to a third party guest of a student.

to raise a genuine issue of fact as to Millersville's control over its campus, which includes Karlie's dorm room in Bard Hall.

Additionally, Millersville cites to *Swanger v. Warrior Run Sch. Dist.*, 346 F. Supp. 3d 689 (M.D. Pa. 2018) to support its argument that the control needed to establish a deliberate indifference claim under Title IX is a causation requirement not met in this case. We disagree. The causation requirement mentioned in *Swanger* is nothing more than a restatement of the Supreme Court's holding in *Davis*. *Id*. at 705-06. Moreover, the holding in *Swanger* was not based on causation, but was instead based on the district court's conclusion that the school district in *Swanger* had acted in a manner that was not clearly unreasonable. *Id*. at 706. In short, *Swanger* does not change our analysis or alter our consideration of the record, which we must construe in the Halls' favor, and which we find demonstrates a genuine dispute of material fact as to Millersville's control over Orrostieta and the context of Karlie's harassment.[4]

---

[4] We similarly disagree with Millersville's claim that "it is impossible to infer any causal connection between the October 4 events . . . and Karlie's murder," as well as Millersville's tacit attempt to shift the blame to Jeanette Hall for failing to notice Karlie's abuse while Orrostieta lived with Karlie. Brief of Appellee at 46. Millersville seems to think the discussion of causation in *Swanger* means that Millersville could only face liability if its actions were the direct cause of Karlie's murder. This is an incorrect understanding of Title IX. Millersville may face liability under Title IX for deliberate indifference that results in a student being excluded from participation in, being denied the benefits of, or being subjected to discrimination under its programs. 20 U.S.C. § 1681(a). The question is thus

ii. Actual Notice

The record also leads us to conclude that there is a genuine issue of fact as to whether Millersville had actual notice of Karlie's harassment. To establish liability for deliberate indifference under Title IX, a plaintiff must show that an "appropriate person" had actual notice of harassment. *Gebser*, 524 U.S. at 290. An appropriate person is "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Id*. Moreover, this Court has held that an educational institution has actual notice of harassment if the institution "knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361 (3d Cir. 2005) (quoting 3C Fed. Jury Prac. & Instr. § 177.36 (5th ed. 2001)). Here, based on the record before us, we find that a jury could reasonably conclude that appropriate persons at Millersville had actual notice of Karlie's harassment.

In particular, the record shows that the abuse and danger Karlie faced from Orrostieta were reported to several persons at Millersville who had some authority to take corrective action

not whether Millersville's alleged deliberate indifference caused Karlie's murder, but whether its deliberate indifference to her harassment resulted in her being excluded from participation in, denied the benefits of, or subjected to discrimination under Millersville's education program. Given the record, we conclude that it is, in fact, possible for a jury to infer such a connection.

26

in this case. For starters, Karlie's harassment was reported to, and by, her resident assistant Sara Wiberg, who described Karlie's harassment in the report she drafted after the October 4th incident. This report stated that Wiberg heard Karlie "scream and yell 'ow'" and that when Orrostieta answered the door, he admitted that things between him and Karlie "got a little physical." District Court Docket No. 147-11. Wiberg's report was sent to Millersville's Deputy Title IX Coordinator, who had the responsibility to investigate reports of sexual misconduct, and who was required under Millersville's Title IX policy to ensure the report was received by Millersville's Title IX Coordinator. The report also was received by Millersville's Area Coordinator, Alison Sehl, who was similarly required under Millersville's Title IX policy to forward the report to the Title IX Coordinator and ensure it was received. In addition, after Tina Flexer informed her mother of Karlie's abuse, Renea Flexer called Millersville Police Department, Millersville Counseling, and Area Coordinator Alison Sehl about Karlie. During these calls, Renea conveyed that Karlie had been injured in a domestic assault with Orrostieta and that she had a visible black and blue eye. Viewing these facts in the light most favorable to the Halls, we cannot agree with Millersville that it is entitled to summary judgment on this element. These facts at least establish a genuine dispute as to whether Millersville had actual notice, if not prove that Millersville had notice as a matter of law.

### iii.    Deliberate Indifference

The next element of the Halls' deliberate indifference claim we consider is whether Millersville University was deliberately indifferent to Karlie's harassment. In *Davis*, the Supreme Court expounded upon the deliberate indifference

standard explaining that it is not a mere reasonableness standard and that to avoid liability a funding recipient must simply respond to known harassment in a manner "that is not clearly unreasonable." *Davis*, 526 U.S. at 649. Here, the record leads us to conclude there is at least a genuine issue of fact as to whether Millersville's conduct constituted deliberate indifference.

The record shows that after receiving Wiberg's report, neither Millersville's Deputy Title IX Coordinator nor its Area Coordinator ensured the report was received by Millersville's Title IX Coordinator, as they were required to do under Millersville's own Title IX policy. Moreover, the record reveals Millersville did not reach out to Karlie after the October 4th incident, and that it did not take any action in response to Renea's calls other than to tell her nothing could be done without a complaining witness. Certainly, Millersville's inaction in response to these reports raises a genuine issue of fact best left for a jury.

Despite this, Millersville maintains there is no question of fact on this element. First, Millersville contends that it did not just do "nothing" in response to Karlie's abuse because the night of the October 4th incident Wiberg got Orrostieta out of Karlie's room. Brief of Appellee at 44. Second, Millersville maintains that its actions in the wake of Wiberg's report and Renea Flexer's calls were mere negligence or bureaucratic inaction, which cannot amount to deliberate indifference. Millersville's arguments are unpersuasive. Though Wiberg's removal of Orrostieta the night of October 4th "took care of the immediate problem," Brief of Appellee at 44, we cannot say this alone establishes Millersville's response to Karlie's abuse was not clearly unreasonable as a matter of law. A reasonable

28

jury could still conclude Millersville acted with deliberate indifference due to its inaction in response to Wiberg's subsequent incident report or Renea Flexer's calls, as well as its failure to generate a police report regarding Orrostieta's removal until after Karlie's death.

Nor can we conclude that Millersville's response to Karlie's harassment constituted mere negligence or bureaucratic inaction. Millersville's Deputy Title IX Coordinator Ron Wiafe admits that after receiving Wiberg's report, he did not follow Millersville's own Title IX policy and forward the report to the Title IX coordinator. Instead, Wiafe made the decision to not report the October 4th incident to the Title IX Coordinator and simply filed Wiberg's incident report away. Similarly, Millersville's Area Coordinator Alison Sehl admits that after receiving Wiberg's incident report, she neither forwarded it to the Title IX Coordinator nor discussed the report with anyone until after Karlie's murder. And, as previously explained, after Millersville Police Department, Millersville Counseling, and Area Coordinator Alison Sehl were separately called by Renea Flexer to discuss Karlie's abuse, each informed Renea that nothing could be done, and each decided to take no further action. When viewed in the light most favorable to the Halls, we simply cannot say this evidence proves that Millersville's response to Karlie's harassment was mere negligence. For the same reasons, we cannot conclude that the conduct of Wiafe, Sehl, and other Millersville personnel in response to reports of Karlie's harassment did not constitute an official decision to not remedy Karlie's harassment. *Gebser*, 524 U.S. at 290. At the very least, this evidence establishes an issue of fact for the jury.

iv.    Severity of Karlie's Harassment

29

The final element of the Halls' deliberate indifference claim we must consider is whether Karlie's harassment was sufficiently severe and pervasive so as to deprive Karlie the benefit of her education. At a minimum, the record here establishes a genuine dispute of fact, as evidence indicates that in the wake of the October 4th incident, Karlie rarely left her room and missed class. Additionally, as the District Court correctly pointed out, a jury could consider Karlie's death when evaluating this element. We thus agree with the District Court that, given these facts, a jury could reasonably conclude that Karlie's harassment was sufficiently severe.[5]

\* \* \*

Altogether, our review of the record convinces us that the Halls have satisfied their burden to defeat Millersville's motion for summary judgment, as there are genuine disputes of fact as to each element of the Halls' deliberate indifference claim. As such, we affirm the portion of the District Court's opinion which held that the existence of these genuine disputes precludes summary judgment in Millersville's favor. Nevertheless, because we disagree with the District Court that Millersville lacked notice, we must reverse. Accordingly, the judgment of the District Court for the Eastern District of

---

[5] In a footnote, Millersville asserts that Karlie must have been in good academic standing after her first semester, and the October 4th incident, because she returned to Millersville for her second semester. Brief of Appellee at 10, n.12. While this may be true, it does not establish that Millersville has demonstrated that no issues of material fact exist as to the severity of Karlie's harassment. At most, it is more evidence to be weighed by the jury.

30

Pennsylvania is reversed, and this case is remanded for further proceedings consistent with this opinion.